UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Jason C. Fritton, Marea Gibson, Brian W. Motzenbeeker, Dawn Duff, and Christopher Shearman, *individually and on behalf of all others similarly situated*, | File No. 22-cv-00415 (ECT/TNL) |
| Plaintiffs, | |
| v. | **OPINION AND ORDER** |
| Taylor Corporation, the Board of Directors of Taylor Corporation, the Fiduciary Investment Committee, and John Does 1-30, | |
| Defendants. | |

Eric Lechtzin, Edelson Lechtzin LLP, Huntingdon Valley, PA; Marc H. Edelson, Edelson Lechtzin LLP, Newton, PA; Daniel E. Gustafson, Daniel C. Hedlund, David A. Goodwin, and Anthony Stauber, Gustafson Gluek PLLC, Minneapolis, MN; Mark K. Gyandoh, Capozzi Adler, PC, Merion Station, PA; and Donald R. Reavey, Capozzi Adler, PC, Harrisburg, PA, for Plaintiffs.

Emily S. Costin, Alston & Bird LLP, Washington, DC; Richard Blakeman Crohan and Margaret Ellen Studdard, Alston & Bird LLP, Atlanta, GA; and Steven C. Kerbaugh, Saul Ewing Arnstein & Lehr, LLP, Minneapolis, MN, for Defendants.

Plaintiffs claim that their former employer, Taylor Corporation, its Board of Directors, Fiduciary Investment Committee, and every individual who served as a director or Fiduciary Investment Committee member during the relevant period,[1] all violated ERISA by mismanaging the corporation's defined-contribution 401(k) and profit-sharing

---

[1] Plaintiffs allege that the relevant "Class Period" starts February 14, 2016, and runs through the entry of any final judgment in this case. Compl. [ECF No. 1] ¶ 1 n.2.

plan (the "Plan").  Plaintiffs allege that Defendants breached their fiduciary duties by authorizing the Plan to pay unreasonably high recordkeeping fees, allowing the Plan's investment portfolio to include options with unreasonably high management fees and needlessly expensive share classes, and allowing the Plan to retain an underperforming fund.

Defendants seek dismissal of the Complaint on two grounds.  The first ground is jurisdictional: Defendants argue that Plaintiffs have not alleged facts plausibly showing that any of them suffered an Article III injury resulting from the alleged ERISA violations and, as a result, lack standing to bring the case.  The second ground challenges the case's merits: Defendants argue that Plaintiffs have not alleged facts plausibly supporting essential elements of their ERISA claims and that, as a result, the Complaint should be dismissed for failing to state a claim.

Plaintiffs plausibly allege Article III injury, but only in connection with their excessive-recordkeeping-expenses claim.  This claim fails on its merits, however, because Plaintiffs do not allege facts plausibly showing that the amount of the Plan's recordkeeping fees are unreasonably high.  This claim's failure leaves Plaintiffs without constitutional standing to pursue their remaining ERISA theories.  Plaintiffs' Complaint will therefore be dismissed without prejudice, and Plaintiffs will be given an opportunity to replead.

I

Begin with the statutory context.  Plaintiffs bring this case under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*  The core allegation is that Defendants as plan fiduciaries breached their duty of prudence imposed

by 29 U.S.C. § 1104(a).  *See* Compl. [ECF No. 1] ¶¶ 115–127.  The duty of prudence requires a plan fiduciary to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use. . . ."  29 U.S.C. § 1104(a)(1)(B).  This duty concerns how a fiduciary "must act."  *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 278 (8th Cir. 2022).  "The process is what ultimately matters, not the results."  *Id.*; *see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009) ("In evaluating whether a fiduciary has acted prudently, we therefore focus on the process by which it makes its decisions rather than the results of those decisions.").  "A plaintiff typically clears the pleading bar by alleging enough facts to '*infer* . . . that the process was flawed.'"  *Matousek*, 51 F.4th at 278 (quoting *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 482–83 (8th Cir. 2020)).  "'[C]ircumstantial allegations about [the fiduciary's] methods' based on the 'investment choices a plan fiduciary made' can be enough."  *Davis*, 960 F.3d at 483 (quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018)).  "The key to nudging an inference of imprudence from possible to plausible is providing 'a sound basis for comparison—a meaningful benchmark'—not just alleging that 'costs are too high, or returns are too low.'"  *Matousek*, 51 F.4th at 278 (quoting *Davis*, 960 F.3d at 484).

II[2]

*The Plan.*  The Plan is a defined contribution 401(k) and profit-sharing plan.  In a defined contribution plan, "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses."  *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015).  Here, Plan participants may contribute to their individual accounts, and Taylor Corporation contributes via matching contributions and perhaps profit sharing.  Compl. ¶¶ 45–46, 52.  During the relevant period, the Plan had at least $575 million in assets under management.  *Id.* ¶ 8.  As of December 31, 2016, the Plan had net assets of more than $633 million and 13,429 participants, and as of December 31, 2020, the Plan had net assets of more than $877 million and 12,157 participants.  *Id.*  This size qualifies the Plan as a "large plan" in the defined-contribution-plan marketplace, meaning "the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments."  *Id.* ¶ 9.

*The Parties.*  The five named Plaintiffs are former employees of Defendant Taylor Corporation, a privately owned printing company; each Plaintiff "participated in the Plan paying the recordkeeping and administrative costs associated with the Plan and investing in the options offered by the Plan, which are the subject of this lawsuit."  *Id.*  ¶¶ 16–20,

---

[2]     In describing the relevant facts, all factual allegations in the Complaint are accepted as true, and all reasonable inferences are drawn in Plaintiffs' favor.  *Meardon v. Register*, 994 F.3d 927, 934 (8th Cir. 2021).

23.[3]   Defendants are the Plan's fiduciaries during the "Class Period," which Plaintiffs define as February 14, 2016, through the date of judgment. *Id.* ¶ 1 n.2. They include Taylor Corporation, Taylor Corporation's Board of Directors, the Board's individual members (whom the Complaint identifies as "John Does 1–10"), the Board's Fiduciary Investment Committee, and the Committee's individual members (whom the Complaint identifies as "John Does 11–20"). *Id.* ¶¶ 1, 23–25, 28–29, 31, 34–35. The last group of John Doe Defendants, 21–30, are any "additional committees, officers, employees and/or contractors of Taylor who are/were fiduciaries of the Plan during the Class Period." Compl. ¶ 37. It makes no practical difference, but to be precise, no one either knows or is saying they know who these possible Defendants might be.

*Involved and relevant non-parties.* Bank of America, N.A. is the Plan's trustee and custodian for the majority of the Plan's investments. *Id.* ¶ 50. Merrill Lynch, Pierce, Fenner & Smith Incorporated has been the Plan's recordkeeper throughout the Class Period. *Id.* ¶ 51. Though neither Bank of America nor Merrill Lynch is a party to this case, their Plan-related activities are relevant to Plaintiffs' claims.

*Alleged fiduciary breaches generally.* Plaintiffs organize their allegations into four categories of failures they believe were breaches of Defendants' fiduciary duty of prudence: (1) the failure to monitor recordkeeping expenses; (2) the failure to select and monitor Plan investment funds such that funds with excessive investment management fees

---

[3]      It appears Plaintiffs are not only *former* Taylor employees, but also are *former* Plan participants. The Complaint is imprecise on the point, but this is what Defendants say in their opening brief, Defs.' Mem. in Supp. [ECF No. 24] at 30, and Plaintiffs do not dispute the point or suggest otherwise, *see* Pls.' Mem. in Opp'n [ECF No. 33] at 10 n.7.

were offered; (3) the failure to select less expensive share classes of funds; and (4) the failure to remove one underperforming fund. *See generally id.* ¶¶ 9, 60–113.

   *The excessive-recordkeeping-expenses theory.* The Plan possessed discretion to charge each participant for Plan administration expenses, including recordkeeping. *Id.* ¶ 54. Of particular significance to Plaintiffs' recordkeeping-expenses theory, the Plan's February 2021 participant-disclosure document reads, in part:

> The Plan's service provider may receive investment-related revenue from one or more of the Plan's investments for providing the above-described administrative services. The Plan Sponsor and service provider have agreed upon $42.00 per participant annually to cover the cost of administrative services.

*Id*. Based on this language, Plaintiffs allege that "the Plan's service provider, Merrill Lynch, may receive investment-related revenue from the investment options offered by the Plan, but [disclosures made by Defendants during the Class Period] fail[] to disclose the amount of such revenue sharing received by Merrill Lynch." *Id.* ¶ 55. Plaintiffs allege that the Plan pays its recordkeeping expenses indirectly by revenue sharing, rather than directly from Plan assets, and this practice resulted in the imposition of excessive, above-market recordkeeping administrative fees. *Id.* ¶¶ 62–63, 67. Plaintiffs allege that "[a]lthough utilizing a revenue sharing approach is not per se imprudent, unchecked, it is extremely costly for Plan participants," and "the best practice is a flat price based on the number of participants." *Id.* ¶¶ 63–66. Regarding the amount of the recordkeeping fees, Plaintiffs allege that Plan participants each paid between about $72 and $96 from 2016 to 2020, amounts Plaintiffs allege are excessive and unreasonable. *Id.* ¶¶ 68–69, 76. Plaintiffs

allege that these higher amounts are the true administrative fees paid to Merrill Lynch, not the disclosed $42 per participant quoted above. *Id.* ¶ 70. Plaintiffs allege that "it was possible for the Plan to negotiate recordkeeping fees for not more than between $20 and $35 per participant" and that several "comparable plans of similar sizes" were charged such fees by their recordkeepers in 2018 or more recently. *Id.* ¶¶ 71–72. As further support for this assertion, the Complaint includes references to a consulting-group report that determined, for individual account plans with $1 billion in assets, administrative fees had dropped to $37 per participant in 2016, and in 2019, plans with over 15,000 participants paid on average $40 per participant for recordkeeping, trust, and custody fees. *Id.* ¶¶ 73–75. Plaintiffs recite further evidence to support the availability of lower fees: a university that reduced its ERISA plan fees to $21–$44 per participant; a recordkeeper that stipulated in a lawsuit that a plan with tens of thousands of participants and over a billion dollars in assets could command fees of $14–$21; and cases involving fees of, or involving expert opinions suggesting fees should be, $37–$42, $18, $20–$27, and $35. *Id.* ¶¶ 76–77 & n.11. Plaintiffs allege that fiduciaries must identify and monitor all fees, including direct compensation and payments through revenue sharing being paid to the recordkeeper, to evaluate whether the fees are reasonable, and that fiduciaries must remain informed about market trends and available rates in the market, usually by periodically conducting a request for proposals (or "RFP"). *Id.* ¶¶ 78–79. Plaintiffs allege that nothing indicates Defendants conducted an RFP to determine whether the Plan could obtain better recordkeeping-fee pricing, and that given the size of the Plan's assets during the Class Period and the trend toward lower recordkeeping fees in the marketplace, the Plan would

have obtained comparable or superior services at a lower cost. *Id.* ¶ 80.  Based on all these allegations, Plaintiffs claim Defendants failed to exercise appropriate judgment with respect to recordkeeping fees, permitted the Plan's service providers to charge excessive fees, and breached their fiduciary duties by failing to adequately monitor and control recordkeeping costs. *Id.* ¶¶ 9–10.

*The excessive-management-fees theory.*  Plaintiffs allege that Defendants failed to prudently select and monitor the Plan's investment options because they selected and continued to offer funds that imposed unreasonably expensive management fees. *Id.* ¶¶ 82–85.  These management fees are for investment management and other services, and plan participants generally pay these costs based on the fund's expense ratio, which is a percentage of assets. *Id.* ¶ 90.  A higher expense ratio reduces a participant's return, and consequently the compounding effect of that return, so prudent plan fiduciaries must consider the effect of expense ratios on investment returns. *Id.*  To evaluate expense ratios, Plaintiffs allege, fiduciaries should obtain competitive pricing information for funds held in plans of similar size and evaluate plan assets against those benchmarks. *Id.* ¶¶ 92–94. Plaintiffs allege that Defendants could not have engaged in a prudent process for evaluating investment management fees because Defendants picked certain investment options with unreasonably high expense ratios.  These allegations fall into two categories.  First, the Plan's default funds for participants who do not make their own investment allocations are T. Rowe Price age-based funds, and "[t]he Plan would have qualified for the collective trust versions of these funds (which were available since 2012) at all times during the Class Period, but [Defendants] failed to move these investments to the [collective investment

trust, or "CIT"] versions of the T. Rowe Price funds," despite the fact that the CIT versions had lower expense ratios. *Id.* ¶¶ 86, 95, 98. Second, Plaintiffs allege that various in-Plan funds, including the T. Rowe Price age-based funds, had expense ratios that were significantly above the "ICI median" for their fund categories. *See id.* ¶¶ 96–98.

*The expensive-share-class theory.* Plaintiffs allege that Defendants selected for inclusion in the Plan more expensive, individual share classes when they could have—and should have—selected lower cost, institutional share classes. Plaintiffs allege there is no difference between the classes other than costs, and a prudent fiduciary would switch to the less expensive share classes. *Id.* ¶¶ 100, 102–04. The Plan would have qualified for these lower cost share classes because of its large size; and even if the Plan did not meet the investment minimum to qualify, as appears to be the case for a few in-Plan funds, "it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan willing to add the fund to its menu of designated investment options." *Id.* ¶¶ 101, 107.

*The single-underperforming-fund theory.* Plaintiffs allege that Defendants acted imprudently by failing to remove from the Plan one fund that consistently underperformed, the Victory Integrity Small Cap Value Fund Class Y. *Id.* ¶ 110. Plaintiffs allege that the Victory Fund "underperformed both its benchmark Morningstar US Small Brd Val Ext TR USD index and lower-cost funds in the same fund category that measured their performance against the same benchmark index," including "the less expensive R6 Class version of the Victory Integrity Small Cap Value Fund." *Id.* ¶¶ 110–12.

*The ERISA claims.*  Based on these various theories, Plaintiffs assert one count for breach of the fiduciary duty of prudence against the Committee and its members.  *Id.* ¶¶ 114–20.  And Plaintiffs allege a second count for breach of fiduciary duties against Taylor, the Board, and the Board's members for failure to adequately monitor other fiduciaries.  *Id.* ¶¶ 121–27.  Plaintiffs seek a declaration that all Defendants breached their fiduciary duties under ERISA; an order compelling Defendants to make good to the Plan all losses resulting from the breaches, to restore any profits made through use of Plan assets, and to restore any profits that Plan participants would have made if Defendants had fulfilled their duties; an order requiring Taylor to disgorge profits received from the Plan; actual damages; costs and attorneys' fees; and other unspecified relief.  *Id.* at 44–45, ¶¶ A–L.

III

Defendants challenge Plaintiffs' standing under Article III, and thus subject-matter jurisdiction.  Because Defendants challenge only the Complaint's sufficiency, this is a "facial" subject-matter jurisdiction challenge.  *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015).  In analyzing a facial attack, a court "restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)."  *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (citations omitted).

To plead Article III standing, a plaintiff must allege facts showing he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  "To establish injury in fact, a plaintiff must show

10

that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* at 339 (internal quotation marks omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).   Complaints that allege "economic or physical harms" are almost always no-doubters.   *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 642 (2007) (Souter, J., dissenting).   This is true even if the alleged harm is "only a few pennies." *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014).   The plaintiff bears the burden of establishing standing and must clearly allege facts demonstrating each element. *Spokeo*, 578 U.S. at 338.

Here, the Complaint's injury allegations are quite general.   Plaintiffs allege they "participated in the Plan paying the recordkeeping and administrative costs associated with the Plan and investing in the options offered by the Plan, which are the subject of this lawsuit."   Compl. ¶¶ 16–20.   Plaintiffs also allege that "each of them participated in the Plan and were injured by Defendants' unlawful conduct."   *Id.* ¶ 21.   That's it.   Seemingly important facts are not alleged.   For example, the Complaint omits allegations describing when any Plaintiff began participating in the Plan, whether any Plaintiff continues to invest in the Plan today, whether or when any Plaintiff ceased to invest in the Plan, the specific funds in which any Plaintiff ever invested, and the period during which any Plaintiff invested in any fund or funds.

Though undetailed, the Complaint's injury allegations plausibly show that each named Plaintiff has Article III standing in one respect: each Plaintiff alleges to have suffered personal economic injury by paying unreasonably high recordkeeping fees.   This

answer seems clear when one compares this claim's basic theory with the Complaint's injury allegations. The theory underlying the recordkeeping-fee claim is straightforward. Plaintiffs allege that recordkeeping expenses were unreasonably high throughout the relevant period. *Id.* ¶¶ 67–76, 80. And Plaintiffs allege that every Plan participant incurred recordkeeping fees. *Id.* ¶ 54. In other words, it doesn't matter that we do not know when each Plaintiff participated in the Plan, or in what funds each Plaintiff invested, because Plaintiffs' excessive-recordkeeping theory is not tied to a particular time period, fund, or funds. The possibility that some Plaintiffs participated in the Plan for a very short time or to a very limited degree might mean that those Plaintiffs have suffered minimal injuries, but as noted above, injury of "only a few pennies" is enough to meet Article III's injury requirement. *Wallace*, 747 F.3d at 1029.

But for their recordkeeping-fee allegations, however, Plaintiffs would have failed to allege Article III injury. This is because Plaintiffs allege no other ERISA theory that necessarily affects every Plan participant (like the recordkeeping theory does), but Plaintiffs have not alleged facts plausibly showing that any of them were injured through any other theory. Plaintiffs' excessive-management-fees theory concerns only particular funds, but Plaintiffs do not allege that they, or any of them, ever invested in any one of these particular funds. Without at least a basic allegation that one or more Plaintiffs invested in one or more funds that are the subject of this claim, Plaintiffs cannot show that any of them suffered injury resulting from the alleged fiduciary breaches this theory challenges. The same is true of Plaintiffs' expensive-share-class and single-underperforming-fund theories. Neither theory implicates every in-Plan fund, but

Plaintiffs do not allege that they, or any of them, ever invested in any fund that is the subject of either theory.

IV

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Considering "matters outside the pleadings" generally transforms a Rule 12(b)(6) motion into one for summary judgment, but not when the relevant materials are "necessarily embraced" by the pleadings. *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (citation omitted). Materials embraced by the complaint include "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) (quoting *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996)). Here, the Complaint includes allegations referring to the content of, and sometimes quoting, various Plan-related documents and other

13

documents like surveys or studies.  Though these documents were not attached to the Complaint, some are included in Defendants' submissions (as exhibits to the Costin Declaration), and no Party questions their authenticity.  It is therefore appropriate to consider these documents in adjudicating Defendants' motion.

Begin with Plaintiffs' claim that the Plan's fiduciaries violated their duty of prudence by failing to adequately monitor recordkeeping expenses.  *See* Compl. ¶¶ 60–81. Again, the core allegation is that these expenses were too high.  *See id.*  "In the absence of 'significant allegations of wrongdoing,' *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014), the way to plausibly plead a claim of this type is to identify similar plans offering the same services for less." *Matousek*, 51 F.4th at 279 (citing *Albert v. Oshkosh Corp.*, 47 F.4th 570, 579–80 (7th Cir. 2022); *Sweda v. Univ. of Pa.*, 923 F.3d 320, 330 (3d Cir. 2019)).[4]  Answering this question is essentially a two-step process.  First, it is necessary to determine what recordkeeping services the Plan offers and the costs accompanying them, either by reference to the Complaint's allegations or a document or documents the Complaint embraces.  *Matousek*, 51 F.4th at 279.  Second, it is necessary to determine whether the complaint includes factual allegations plausibly showing that the fees for these

---

[4]      Plaintiffs do not claim to advance allegations of wrongdoing that are "significant" in the relevant sense.  *See Tussey*, 746 F.3d at 336 ("The facts of this case . . . involve significant allegations of wrongdoing, including allegations that ABB used revenue sharing to benefit ABB and Fidelity at the Plan's expense.").  Notably, Plaintiffs allege that they "do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting and monitoring the Plan's recordkeeper."  Compl. ¶ 58.

services are too high in relation to a meaningful benchmark—that is, a "like-for-like comparison." *Id.*

What recordkeeping services does the Plan offer?  The Complaint alleges only generally that "'recordkeeping' is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's 'recordkeeper,'" and that "[n]early all recordkeepers in the marketplace offer the same range of services."  Compl. ¶ 60.  The Complaint identifies "managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing" as generic examples of these services.  *Id.*  Participant-disclosure forms filed by Defendants in support of their motion (and embraced by the pleadings, *Matousek*, 51 F.4th at 279) seem to show that the Plan's recordkeeper, Merrill Lynch, processed participants' investment directives, kept track of participant accounts and transactions, and provided "services such as call centers, websites, account statements and educational materials related to saving and investing for retirement."  ECF No. 25-3 at 4.  Other "Annual Return/Report of Employee Benefit Plan" forms (also labeled Form 5500s) filed by Defendants include codes signaling that Merrill Lynch provided recordkeeping and information management services, including "computing, tabulating, data processing," and investment management services. *E.g.*, ECF No. 25-1 at 122 (identifying Service Codes); *see also* 2016 and 2021 Instructions for Schedule C (Form 5500).  The bottom line seems to be that, as Plaintiffs allege in the Complaint, Merrill Lynch provided a typical set of recordkeeping services.

What fees are charged for these services?  The Complaint includes the following quotation from the February 2021 participant-disclosure form:

> ***The Plan's service provider may receive investment-related revenue from one or more of the Plan's investments for providing the above-described administrative services.*** The Plan Sponsor and service provider have agreed upon $42.00 per participant annually to cover the cost of administrative services. These costs may or may not be charged to participant accounts on a pro rata basis (i.e., based upon a participant's account balance relative to total Plan assets) or a per capita basis (i.e., a flat fee for each participant account), as the Plan fiduciary chooses. Any charges to participant accounts may vary from year to year and based upon your Plan's rules.

> There may be other applicable Plan administrative fees and expenses arising from time to time that may be charged to participant accounts as determined by the Plan Sponsor.

Compl. ¶ 54. Plaintiffs' emphasis on this quotation's first sentence is intended to make obvious that Merrill Lynch may have received payment for its recordkeeping services through revenue sharing—that is, payments from investments (funds) within the Plan to compensate for recordkeeping and trustee services that the fund otherwise would have to provide. *Id.* ¶ 62. And Plaintiffs allege that this occurred, resulting in recordkeeping fees higher than $42 per participant annually. Specifically, by dividing the total compensation paid to Merrill Lynch by the number of Plan participants, Plaintiffs allege that from 2016 through 2020, the average per-participant recordkeeping fee ranged from $72.20 to $95.54, or an average of $83.37. *Id.* ¶¶ 68, 70.[5]

---

[5]    Defendants dispute these figures and argue that Plaintiffs have not plausibly alleged that Merrill Lynch received anything more than $42 per participant annually. *See* Defs.' Mem. in Supp. [ECF No. 24] at 23–25; Defs.' Reply Mem. [ECF No. 39] at 10–11. This argument is not persuasive. Plaintiffs allege that Merrill Lynch received compensation for its recordkeeping services in amounts greater than $42 per participant; they identify precise dollar amounts for each year from 2016 through 2020. Compl. ¶ 68. It is true that Plaintiffs cite no source for these greater-than-$42-per-participant (labeled "indirect compensation") figures, but they don't have to. No rule requires a plaintiff generally to cite authority for a

What like-for-like comparison or comparisons do Plaintiffs make, and do these comparisons plausibly show that the recordkeeping fees the Plan charged were too high? On this question, it seems fair to separate the Complaint's allegations into four categories.

*First*, Plaintiffs include a table showing the per-participant recordkeeping fees for nine "comparable plans of similar sizes of assets under management in 2018," and comparing these fees to the Plan's 2018 per-participant fee of $79.10. *Id.* ¶ 72. These comparisons are not like-for-like. As Defendants point out, Plaintiffs calculated the per-participant fee for each putative comparator plan by dividing only the *direct* compensation paid by the plan to its recordkeeper (evidently obtained from each plan's 2018 Form 5500) by the number of plan participants. *Compare, e.g.*, Compl. ¶ 72 *with* ECF No. 25-3 at 29. Plaintiffs used a very different approach to calculating the per-participant fee charged by the Taylor Corporation Plan in 2018 and the other at-issue years. To calculate that number, Plaintiffs included in the numerator not just *direct* compensation, but also *indirect* compensation, yielding a much larger quotient. Compl. ¶¶ 68, 70. Applying the approach Plaintiffs used in calculating the per-participant recordkeeping fees for the comparator plans to the Taylor Corporation Plan would leave a quotient—or 2018 per-participant

---

complaint's factual allegations in the complaint. Rule 8's "short and plain statement" requirement would seem at odds with such a requirement, and Rule 11 addresses and covers the need for factual contentions to have evidentiary support. It is true that a complaint's factual allegations are implausible if contradicted by materials the complaint embraces, but we don't have that situation here. Leaving aside whether the February 2021 participant-disclosure form is ambiguous concerning the issue, the Plan's Form 5500s show that Merrill Lynch received indirect compensation, *see, e.g.*, ECF No. 25-1 at 122, and Defendants have not explained how the Form 5500s contradict Plaintiffs' allegations as to the amount of this compensation.

recordkeeping fee—of $12.65.  The bottom line is that, because the math Plaintiffs used to calculate the Taylor Corporation Plan's annual per-participant recordkeeping fee differs so fundamentally from the math Plaintiffs used to calculate these other plans' 2018 per-participant recordkeeping fees, these other plans' fees are not plausible comparators and say nothing helpful about whether the Taylor Corporation Plan's recordkeeping fees are too high.

*Second*, Plaintiffs rely on two reports prepared by consulting group NEPC, LLC—one from 2014, the other from 2019—showing respectively "that for individual account plans with $1 billion in assets, administrative fees had dropped to $37 per participant," and "that plans with over 15,000 participants paid on average $40 or less in per participant recordkeeping, trust and custody fees." *Id.* ¶¶ 73–75.  The Eighth Circuit rejected reliance on a report from this same consulting group in *Matousek*.  There, the court explained:

> Rather than point to the fees paid by other specific, comparably sized plans, the plaintiffs rely on industry-wide averages.  But the averages are not all-inclusive: they measure the cost of the typical "suite of administrative services," not anything more. And using this information creates a mismatch between Merrill Lynch's total compensation, which includes everything it does for MidAmerican's plan, and the industry-wide averages that reflect only basic recordkeeping services.

> The first source, published by a consulting group called NEPC, says that no similarly sized retirement plan paid more than $100 per participant for recordkeeping, trust, and custodial services.  MidAmerican's plan compares favorably, with the fees for these basic recordkeeping services totaling between $32 and $48 per plan participant.  NEPC's report says nothing about the fees for the other services that Merrill Lynch provided, which means it cannot provide a "sound basis for comparison" for anything else.  *Meiners* [*v. Wells Fargo & Co.*], 898 F.3d [820,] [] 822 [(8th Cir. 2018)]; *see Smith v.*

> *CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022)
> (rejecting a comparison to industry averages because the
> plaintiff "ha[d] not pleaded that the services that [the plan's]
> fee covers are equivalent to those provided by the plans
> comprising the average in the industry publication that she
> cite[d]").

*Matousek*, 51 F.4th at 279–80.  It would seem dubious here to rely on the same kind of industry-wide report the Eighth Circuit rejected in affirming the Rule 12(b)(6) dismissal of an ERISA recordkeeping claim roughly two months ago.  Regardless, the same essential problem the court encountered in *Matousek* is present here.  The Complaint includes no allegations describing how either the 2014 or 2019 NEPC report calculated per-participant recordkeeping fees.  It is entirely possible, for example, that NEPC used the same approach Plaintiffs used in calculating the per-participant fees for the would-be comparator plans.  If that is the situation, the Taylor Corporation Plan compares favorably.  The point is that we don't know, and the absence of this information means the NEPC reports are not meaningful benchmarks.

*Third*, Plaintiffs rely on "numerous authorities" showing "that reasonable rates for large plans typically average around $35 per participant, with costs coming down every day."  Compl. ¶ 76.  Plaintiffs support this more general assertion with allegations regarding steps taken by "the University of Chicago ERISA fiduciaries" to reduce per-participant fees to $21–$44, and that recordkeeper Fidelity "recently stipulated in a lawsuit that a plan with tens of thousands of participants and over a billion dollars in assets could command recordkeeping fees as low as $14–$21 [per participant]."  *Id.* ¶ 77.  These allegations are not meaningful benchmarks for the same reason described in the preceding

paragraph.  We do not know how these numbers were calculated.  That concern aside, the Complaint lacks allegations plausibly showing that a plan sponsored by the University of Chicago is a viable comparator to the Taylor Corporation Plan or that Fidelity's stipulated fee range—in view of whatever circumstances prompted the stipulation—make that range a meaningful benchmark.

*Fourth*, Plaintiffs allege that an ERISA "plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans," and that "[t]his will generally include conducting a Request for Proposal ('RFP') process at reasonable intervals." *Id.* ¶ 79.  Plaintiffs then allege that "there is nothing to suggest that Defendants conducted [an] RFP at reasonable intervals – or certainly at any time from 2016 through the present – to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers." *Id.* ¶ 80.  These allegations do not plausibly show a fiduciary breach.  Defendants argue that, as a legal matter, ERISA does not compel competitive bidding.  Defs.' Mem. in Supp. at 28.  Plaintiffs do not respond to this argument.  *See* Pls.' Mem. in Opp'n at 25–28.  This legal issue aside, the factual assertion that "there is nothing to suggest that" Defendants engaged in an RFP process seems to be another way of speculating this did not happen, and that is insufficient under Rule 12(b)(6).  Compl. ¶ 80; *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").

*

The bottom line is that Plaintiffs have not alleged facts plausibly showing that Defendants (or any of them) breached their fiduciary duty of prudence by authorizing the

imposition of unreasonably excessive recordkeeping fees.  The next question is what effect this failure—that is, the dismissal of Plaintiffs' excessive-recordkeeping-expenses theory—has on Plaintiffs' remaining theories in light of the absence of allegations showing whether any Plaintiff suffered injury in connection with any of the remaining theories.

V

There is a jurisdictional problem with respect to Plaintiffs' remaining theories. Again, this problem becomes evident when one compares the Complaint's injury-related allegations against Article III's redressability requirement.  To recap, but for their recordkeeping-fee injury allegations, Plaintiffs would fail to allege any Article III injury. Plaintiffs allege no other ERISA theory that necessarily affects every Plan participant (like the recordkeeping theory does).  And Plaintiffs have not alleged facts plausibly showing that any of them were injured through any other theory—*i.e.*, Plaintiffs do not allege that any of them invested a particular fund that is the subject of any of the remaining excessive-management-fees, expensive-share-class or single-underperforming-fund theories. Without these allegations, a hypothetical judgment in Plaintiffs' favor on any one of these theories would do nothing for any Plaintiff.  For example, a judgment determining that Defendants acted imprudently in selecting and retaining funds that charged excessive management fees would benefit only those Plan participants who invested in those funds and paid those fees.  But the Complaint includes no allegations showing that Plaintiffs fall in that category.

The Supreme Court has addressed this situation in a comparable context.  In *Thole v. U.S. Bank N.A.*, the plaintiffs participated in a defined-benefit plan and asserted no

21

ERISA claim based on monetary injuries they personally suffered.  --- U.S. ---, 140 S. Ct.

1615, 1618–19 (2020).  Regarding Article III's redressability element, the court explained:

> Thole and Smith have received all of their monthly benefit payments so far, and the outcome of this suit would not affect their future benefit payments.  If Thole and Smith were to *lose* this lawsuit, they would still receive the exact same monthly benefits that they are already slated to receive, not a penny less. If Thole and Smith were to *win* this lawsuit, they would still receive the exact same monthly benefits that they are already slated to receive, not a penny more.  The plaintiffs therefore have no concrete stake in this lawsuit. . . . Because the plaintiffs themselves have no concrete stake in the lawsuit, they lack Article III standing.

*Id.* at 1619.  The same is true of Plaintiffs' remaining claims or theories in this case.

Without allegations that any Plaintiff invested in any fund that is a target of their remaining

theories, Plaintiffs have not plausibly shown that a loss or win on any one of these theories

would make any difference.

It is true, as Plaintiffs point out, that the Eighth Circuit has held that an ERISA plan

participant who alleges injury to her own account has Article III standing to pursue relief

under ERISA's civil enforcement provision for injuries to the plan or other participants,

including injuries that the participant-plaintiff did not suffer personally.  *Braden*, 588 F.3d

at 591–94.  And this rule is well-established.  *See, e.g.*, *Parmer v. Land O'Lakes, Inc.*, 518

F. Supp. 3d 1293, 1301 (D. Minn. 2021) (understanding *Braden* to have "held that the

plaintiff had standing to challenge an entire retirement plan even though plaintiff did not

enroll in all of the challenged investment options[]"); *Becker v. Wells Fargo & Co.*, No.

20-cv-2016 (DWF/BRT), 2021 WL 1909632, at *3 (D. Minn. May 12, 2021) ("The Court

finds that in addition to satisfying the requirements of her own Article III standing, Becker

has plausibly alleged that Defendants' fiduciary violations caused broad-sweeping losses to other Plan investments in which she did not invest that stemmed from Defendants' imprudent or disloyal conduct.  Accordingly, the Court finds that Becker has Article III standing to seek relief on behalf of the Plan as a whole.") (citations omitted); *Rosenkranz v. Altru Health Sys.*, No. 3:20-cv-168, 2021 WL 5868960, at *5–7 (D.N.D. Dec. 10, 2021) (same); *Anderson v. Coca-Cola Bottlers' Ass'n*, No. 21-2054-JWL, 2022 WL 951218, at *3 (D. Kan. Mar. 30, 2022) ("The majority of courts . . . have concluded that the participant's standing does extend to other funds in the plan.").

Though settled and binding, this rule does not seem apt or to change things here. Plaintiffs alleged Article III injury in connection with only one theory—the excessive-recordkeeping-fee theory—and that claim has been dismissed.  *Braden* does not address this circumstance.  It says that "a plaintiff may be able to assert causes of action which are based on conduct that harmed him, but which sweep more broadly than the injury he personally suffered." *Braden*, 588 F.3d at 592.  It does not say that a plaintiff whose Article III injury resulted only in connection with a dismissed claim nonetheless has constitutional standing to proceed with claims based on conduct that did not cause her Article III injury. Reaching the opposite conclusion would appear contrary to *Thole*.  It would also create a seemingly absurd result: a hypothetical plaintiff who claimed injury resulting only from a dubious ERISA claim could, notwithstanding the Rule 12(b)(6) dismissal of that claim, press ahead with other more viable ERISA theories based on actions that did not personally injure the plaintiff.  I conclude that the dismissal of Plaintiffs' recordkeeping-fee claim, together with the absence of allegations plausibly showing that Plaintiffs suffered Article

III injury in connection with any other theory, leaves Plaintiffs without constitutional standing to pursue their remaining claims.

VI

Plaintiffs will be permitted an opportunity to file an amended complaint. If Plaintiffs go that route, any amended complaint may address the merits-based shortcomings of the excessive-recordkeeping-fees claim, the absence of allegations showing Article III injury with respect to the remaining theories, and the merits-based shortcomings of the remaining theories identified in Defendants' motion. Though debatable, I conclude this approach is wiser as a practical matter. Fed. R. Civ. P. 1.

Regarding the Rule 12(b)(6) dismissal of the recordkeeping claim, a dismissal with prejudice is typically appropriate when a plaintiff has shown "persistent pleading failures" despite one or more opportunities to amend, *Milliman v. Cnty. of Stearns*, No. 13-cv-136 (DWF/LIB), 2013 WL 5426049, at *16 (D. Minn. Sept. 26, 2013); *see Reinholdson v. Minnesota*, No. 01-cv-1650 (RHK/JMM), 2002 WL 32658480, at *5 (D. Minn. Nov. 21, 2002) (adopting report and recommendation), or when the record makes clear that any amendment would be futile, *see Paisley Park Enters. v. Boxill*, 361 F. Supp. 3d 869, 880 n.7 (D. Minn. 2019). On the other hand, when a plaintiff's claims "might conceivably be repleaded with success," dismissal without prejudice may be justified. *Washington v. Craane*, No. 18-cv-1464 (DWF/TNL), 2019 WL 2147062, at *5 (D. Minn. Apr. 18, 2019), *report and recommendation adopted*, 2019 WL 2142499 (D. Minn. May 16, 2019). The excessive-recordkeeping-fees claim is better understood as falling in the latter category.

Regarding the other claims as to which Plaintiffs have not plausibly alleged Article III injury, the jurisdictional character of this dismissal requires that it be without prejudice. *List v. Cnty. of Carroll*, 240 F. App'x 155, 156 (8th Cir. 2007) (per curiam) (noting that a dismissal for lack of subject-matter jurisdiction is effectively "a dismissal without prejudice"); *Cnty. of Mille Lacs v. Benjamin*, 361 F.3d 460, 464 (8th Cir. 2004) ("A district court is generally barred from dismissing a case with prejudice if it concludes subject matter jurisdiction is absent."). Plainly, in this case's context, "judicial efficiency would be promoted by allowing leave to amend . . . rather than requiring [Plaintiffs] to commence a separate action." *Lee v. Hennepin Cnty.*, No. 13-cv-1328 (PJS/AJB), 2013 WL 6500159, at *4 (D. Minn. Dec. 11, 2013); *see also Penrod v. K&N Eng'g, Inc.*, No. 18-cv-02907 (ECT/LIB), 2019 WL 1958652, at *6 (D. Minn. May 2, 2019).

Plaintiffs will be ordered to file any amended complaint within thirty days of the date of this order, or on or before January 11, 2023. If no amended complaint is filed by that deadline, the excessive-recordkeeping-fees claim will be dismissed with prejudice and on the merits, and the remainder of the case will be dismissed without prejudice for lack of subject-matter jurisdiction.[6]

---

[6]   It is true that Plaintiffs did not comply with Local Rule 15.1(b) or attempt to show in some other way how an amended pleading might address the issues identified in Defendants' motion. Plaintiffs' request for leave to amend appears only in the second half of the final sentence of their opposition brief. Pls.' Mem. in Opp'n at 30 ("For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss, or in the alternative, grant Plaintiffs leave to amend."). Raising the request in this passing way invites risk. *See Far East Aluminum Works Co. Ltd. v. Viracon, Inc.*, 27 F.4th 1361, 1367 (8th Cir. 2022). And because of how it was presented, Defendants justifiably objected to this request at the hearing. Though LR 15.1(b) serves important interests, including in the area of litigation efficiency, it makes better sense here to look

**ORDER**

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS**

**ORDERED THAT**:

1.      Defendants' Motion to Dismiss [ECF No. 21] is **GRANTED**.

2.      Plaintiffs' excessive-recordkeeping-fees claim is **DISMISSED WITHOUT**

**PREJUDICE** pursuant to Federal Rule of Civil Procedure 12(b)(6).

3.      Plaintiffs' remaining claims are **DISMISSED WITHOUT PREJUDICE**

for lack of subject-matter jurisdiction Pursuant to Federal Rule of Civil Procedure 12(b)(1).

4.      Within 30 days of the date of this Order, or on or before January 11, 2023,

Plaintiffs may file an amended complaint.  If no amended complaint is filed by that

deadline, the excessive-recordkeeping-fees claim will be dismissed with prejudice and on

the merits, and the remainder of the case will be dismissed without prejudice for lack of

subject-matter jurisdiction.


Dated: December 12, 2022                    s/ Eric C. Tostrud
                                            Eric C. Tostrud
                                            United States District Court

---

past this violation.  The truth is that this result, and the way it was reached, was not contemplated or addressed specifically by the Parties when the motion was briefed and argued.  And denying Plaintiffs the opportunity to amend risks putting the case in an odd posture: Plaintiffs would be compelled to appeal the Rule 12(b)(6) dismissal of the recordkeeping-fee claim to the Eighth Circuit.  At the same time, Plaintiffs could appeal the jurisdictional ruling or perhaps might attempt to file a new case and complaint asserting the other theories supported by additional and more specific jurisdictional allegations. Especially considering the familiarity gained with the case in adjudicating Defendants' motion, better for me just to keep the case if Plaintiffs are intent on attempting to press ahead.