# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| JASON C. FRITTON, MAREA GIBSON, BRIAN W. MOTZENBEEKER, DAWN DUFF, and CHRISTOPHER SHEARMAN, individually and on behalf of all others similarly situated, | Case No. 0:22-cv-00415 (ECT/TNL) |
| | **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| TAYLOR CORPORATION, the BOARD OF DIRECTORS OF TAYLOR CORPORATION, the FIDUCIARY INVESTMENT COMMITTEE, and JOHN DOES 1-30, | |
| Defendants. | |

## <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

Plaintiffs Jason C. Fritton, Marea Gibson, Brian W. Motzenbeeker, Dawn Duff, and Christopher Shearman ("Plaintiffs"), by and through their attorneys, on behalf of the Taylor Companies 401(k) and Profit Sharing Plans (the "Plan"),[1] themselves and all others similarly situated, allege as follows:

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

## I.      INTRODUCTION

1.      Plaintiffs bring this class action pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Taylor Corporation ("Taylor" or "Company"), the Board of Directors of Taylor during the Class Period[2] ("Board") and its members, and the Fiduciary Investment Committee ("Committee") and its members, for breaches of their fiduciary duties during the Class Period.

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).

3.      The U.S. Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."[3]

---

[2] The "Class Period" is defined as February 14, 2016 through the date of judgment.

[3] U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at n.3, available at A Look at 401(k) Plan Fees (dol.gov) (last visited December 27, 2021).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of services to the plan and investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.[4]

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[5]

6.      Additional fees of only 0.18% or 0.4% can have a large impact on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.      Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. Although 401(k) accounts are fully

---

[4] *See also A Look at 401(k) Plan Fees*, at 2 ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").
[5] *See also A Look at 401(k) Plan Fees*, at 2 ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

funded at all times, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

8.      At all times during the Class Period, the Plan had at least $575 million in assets under management,[6] which were, and continue to be, entrusted to the care of Defendants – the Plan's fiduciaries. As of December 31, 2016 (the end of the first year of the Class Period), the Plan had net assets of more than $633 million and 13,429 participants with account balances. As of December 31, 2020 (the most recently reported financials at the time this case was commenced), the Plan had net assets of more than $877 million and 12,157 participants with account balances. In September 2022, the Plan filed its Annual Return/Report on form 5500 for the year ended December 31, 2021, which disclosed the Plan had net assets of more than $946 million and 10,645 participants with account balances.

9.      The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace. As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, *inter alia*, failed to exercise appropriate judgment and permitted the Plan's service providers to charge excessive administrative fees and expenses.

10.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. §

---

[6] *See* Financial Statements for the Plan appended to Form 5500 for the year ended December 31, 2015.

1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by failing to adequately monitor and control the Plan's recordkeeping costs.

11.    Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

12.    Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.    JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

14.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

15.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391, because Defendants do business in this District and a

substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.   PARTIES

**Plaintiffs**

16.     Plaintiff Jason C. Fritton ("Fritton") resides in Overland Park, Kansas. Plaintiff Fritton was hired by Taylor in July 2016 and enrolled in the Plan prior to September 30, 2016. Fritton terminated his participation in the Plan in 2020. Throughout his participation in the Plan, Plaintiff Fritton paid the recordkeeping and administrative costs associated with the Plan that are complained of herein. In addition, Plaintiff Fritton invested in certain of the options offered by the Plan that are the subject of this lawsuit, including the following:

- Eaton Vance Atlanta Capital SMID-Cap Fund (EISMX)
- Van Eck Emerging Markets (EMRIX)
- Columbia Small Cap Index Class Z (NMSCX)
- Columbia Midcap Index Fund Class Z (NMPAX)
- Wells Fargo Special Mid Cap Value Fund Class Instl (WFMIX)
- Artisan Mid Cap Fund Investor Class (ARTMX)
- Winslow Large Cap Growth Fund 120
- Northern Trust S&P 500 Non-Lending Class N
- Cohen & Steers Realty Shares Fund Class N (CSRSX)
- Franklin Small Cap Growth Fund Advisor Class (FSSAX)
- JPMorgan Equity Income Class R5 (OIERX)
- American EuroPacific Growth Fund R5 (RERFX)
- Metropolitan West Total Return Bond Fund I (MWTIX)
- Goldman Sachs Inflation Protected Securities Fund Instl (GSIPX)
- Morley Stable Value Fund 25a

17.     Plaintiff Marea Gibson ("Gibson") resides in Charleston, Indiana. Plaintiff Gibson enrolled in the Plan in or around May 2018 and terminated his participation in June

2020. Throughout his participation in the Plan, Plaintiff Gibson paid the recordkeeping and administrative costs associated with the Plan that are complained of herein. In addition, Plaintiff Gibson invested in certain of the options offered by the Plan that are the subject of this lawsuit, including the following:

- T Rowe Price Retirement 2040 Fund Inv Class

18.     Plaintiff Brian W. Motzenbeeker ("Motzenbeeker") resides in Eatontown, New Jersey. Plaintiff Motzenbeeker was hired by Taylor in August 2015, and he enrolled in the Plan shortly thereafter. Motzenbeeker terminated his participation in mid-2020. Throughout his participation in the Plan, Plaintiff Motzenbeeker paid the recordkeeping and administrative costs associated with the Plan that are complained of herein. In addition, Plaintiff Motzenbeeker invested in certain of the options offered by the Plan that are the subject of this lawsuit, including the following:

- Eaton Vance Atlanta Capital SMID-Cap Fund (EISMX)
- Van Eck Emerging Markets (EMRIX)
- Columbia Small Cap Index Class Z (NMSCX)
- Columbia Midcap Index Fund Class Z (NMPAX)
- Artisan Mid Cap Fund Investor Class (ARTMX)
- Northern Trust S&P 500 Non-Lending Class N
- Cohen & Steers Realty Shares Fund Class N (CSRSX)
- Franklin Small Cap Growth Fund Advisor Class (FSSAX)
- T Rowe Price Retirement 2040 (TRRDX)
- JPMorgan Equity Income Class R5 (OIERX)
- American EuroPacific Growth Fund R5 (RERFX)
- Metropolitan West Total Return Bond Fund I (MWTIX)
- Goldman Sachs Inflation Protected Securities Fund Instl (GSIPX)
- Morley Stable Value Fund 25a

19.     Plaintiff Dawn Duff ("Duff") resides in Covington, Ohio. Plaintiff Duff was hired by Taylor in April 2017, and she enrolled in the Plan shortly thereafter. Duff

terminated her participation in mid-2019. Throughout her participation in the Plan, Plaintiff Duff paid the recordkeeping and administrative costs associated with the Plan that are complained of herein. In addition, Plaintiff Duff invested in certain of the options offered by the Plan that are the subject of this lawsuit, including the following:

- Columbia Midcap Index Fund Class Z (NMPAX)
- Northern Trust S&P 500 Non-Lending Class N
- Franklin Small Cap Growth Fund Advisor Class (FSSAX)
- T Rowe Price Retirement 2040 (TRRDX)
- T Rowe Price Retirement 2045 Fund Inv Class (TRRKX)
- JPMorgan Equity Income Class R5 (OIERX)
- Metropolitan West Total Return Bond Fund I (MWTIX)
- Morley Stable Value Fund 25a

20.     Plaintiff Christopher Shearman ("Shearman") resides in North Mankato, Minnesota. Plaintiff Shearman was hired by Taylor in September 2016, and he enrolled in the Plan shortly thereafter. Shearman terminated his participation in early-2019. Throughout his participation in the Plan, Plaintiff Shearman paid the recordkeeping and administrative costs associated with the Plan that are complained of herein. In addition, Plaintiff Shearman invested in certain of the options offered by the Plan that are the subject of this lawsuit, including the following:

- T Rowe Price Retirement 2040 (TRRDX)

21.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan, they paid the recordkeeping and administrative costs associated with the Plan that are complained of herein, they collectively invested in every investment option offered by the Plan during the Class Period (with the exception of the Victory Integrity Small Cap Value Fund), and they were injured by Defendants' unlawful

conduct alleged herein.[7] Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

22.    Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, and total cost comparisons to similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

## **Defendants**

### **The Company Defendant**

23.    Taylor Corporation, a privately owned printing company with more than 80 subsidiaries, is the Plan sponsor, the Plan Administrator (as defined in Section 3(16) of ERISA), and a named fiduciary, with a principal place of business being 1725 Roe Crest Drive, North Mankato, Minnesota 56003. *See* Taylor Corporation Plan Document,

---

[7] Although Plaintiffs did not invest in each vintage (2010 – 2060) in the suite of T. Rowe Price Retirement Target Date Funds, this collection of target date funds should be considered as a single investment offering because no retirement plan would offer only one vintage – they are marketed collectively and offered to 401(k) plans and plan participants as an integrated suite of funds.

amended and restated as of January 1, 2017, at 77 ("Plan Document"); *see also* Form 5500 filed with the DOL for the period ended December 31, 2020 ("2020 Form 5500"), at 1.

24.     The Company, acting through its Board of Directors, appointed fiduciaries of the Plan, including the Committee. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

25.     Taylor, through its Board, had a fiduciary duty to monitor and supervise the Plan's fiduciaries, including the Committee and its members during the Class Period, but, as set forth in detail below, the Committee failed to carry out these fiduciary duties prudently.

26.     Taylor also served as the Plan's "Investment Fiduciary" with the discretionary authority and responsibility set forth in Section 12.02 of the Plan Document, which include, *inter alia*, managing the "investment of the Trust Fund," appointing "one or more Investment Managers," and hiring advisors and consultants for the Plan.

27.     For the foregoing reasons, at all times during the Class Period, Taylor was a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority over management or disposition of Plan assets and because it exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

### Board Defendants

28.     Taylor, acting through its Board of Directors, appointed Plan fiduciaries, including the Committee. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

29.     Accordingly, the Board and each of its members during the Class Period(referred to herein as John Does 1-10)  is or was a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets and because each exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

30.     The Board has also exercised discretion to authorize Taylor to contribute annual profit-sharing amounts to the Plan's participants.

### Fiduciary Investment Committee Defendant

31.     Taylor has delegated certain administrative and investment related authority and responsibility to the Fiduciary Investment Committee ("Committee"), and the Committee and its members are named fiduciaries of the Plan. *See* Notes to Financial Statements for the year ended December 31, 2020, at 5.

32.     The Committee "has the power to carry out provisions of the Plan, including the administration of the Plan, and to determine the appropriateness of the Plan's investment offerings, and monitors investment performance." *Id*.

11

33.     The Committee's fiduciary duties and responsibilities with respect to the management and oversight of the Plan include:

- Ensuring fees paid to service providers and other expenses are reasonable;

- Approving the appointment of investment managers for the Plan, and the policies and operating procedures governing investment managers;

- Monitoring the investment performance of the Plan;

- Receiving, reviewing, and maintaining on file reports of investment performance, financial condition, receipts and disbursements of the Plan's assets;

- Appointing and retaining individuals and/or entities to assist in the administration of the Committee's duties under its governing documents; and

- Reporting to the Board.

34.     The Committee exercised this discretionary authority throughout the Class Period. Thus, the Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

35.     Plaintiffs do not have access to documents and information sufficient to identify any members of the Committee during the Class Period. Accordingly, the unnamed members of the Committee during the Class Period are referred to herein as John Does 11-

20. The Committee and John Does 11-20 are collectively referred to herein as the "Committee Defendants."

36.    As alleged in detail below, the Committee Defendants failed to properly discharge their fiduciary duties and responsibilities during the Class Period.

**John Doe Defendants**

37.    To the extent that there are additional committees, officers, employees and/or contractors of Taylor who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Taylor officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

## IV.   CLASS ACTION ALLEGATIONS

38.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[8]

> All persons, except Defendants and their immediate family members, and the Court and Court staff handling this matter, who were participants in or

---

[8] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action. Additionally, although this is a proposed class action, the allegations in this complaint are alternatively asserted derivatively on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See*, *e.g.*, *In re: Wilmington Trust Corp.*, 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting

beneficiaries of the Plan at any time between February 14, 2016 through the date of judgment (the "Class Period").

39.     The members of the Class are so numerous that joinder of all members is impractical. As of December 31, 2016, the Plan had 13,429 "participants with account balances…." 2016 Form 5500, at 2. As of December 31, 2020, the Plan had 12,157 "participants with account balances…." 2020 Form 5500, at 2.

40.     Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

41.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

      A.     Whether Defendants are/were fiduciaries of the Plan;

---

plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009) ("Courts have recognized that a plaintiff with Article III standing may proceed under § 1132(a)(2) on behalf of the plan or other participants.").

B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C.     Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

42.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

43.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

44.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class,

thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.   THE PLAN

45.    The Plan is a qualified defined contribution or individual account retirement plan, specifically a profit sharing plan with a qualified cash or deferred arrangement.

46.    Taylor originally adopted a profit sharing plan in 1965. *Id*. at 2. A separate 401(k) plan was established in 198. *Id*. The separate plans were merged in 2004 to form the Plan at issue in this case. 2016 Summary Plan Description at 1.

47.    An "Account" under Article 2 of the Plan Document means "the balance of a Participant's interest in the Trust Fund," and is comprised of the aggregate of his or her pre-tax and post-tax contribution accounts, including "an Elective Deferral Account, Pre-tax Elective Deferral Account, Roth Elective Deferral Account Matching Contribution Account, … Profit Sharing Contribution Account, Rollover Contribution Account, Qualified Non-Elective Contribution Account, Transfer Account and such other Account(s) or subaccount(s) as the Plan Administrator, in its discretion, deems appropriate." *Id.*; *see also* Summary Plan Description at 3.

48.    Retirement benefits provided by the Plan are based solely on the amounts contributed to a participant account, and any income or gains (or losses) on such contributions, less any expenses that may be allocated to such participant's account.

49.    Taylor is the Plan Administrator and a named fiduciary of the Plan within the meaning of ERISA Section 402. Plan Document, Article 2. Under the Plan Document, the Plan Administrator has "total and complete discretionary power and authority" with respect

16

to: (a) determining the amount, the form and timing of benefits payable under the Plan; (b) determining the amount and manner of any allocations and/or benefit accruals under the Plan; (c) maintaining and preserving records relating to participants; (d) furnishing participants with information and required notices; (e) preparing and filing with the U.S. Department of Labor all reports and other required information; (f) approving loans; (g) hiring professional assistants and consultants as it deems necessary; (h) arranging for bonding; and (i) communicating with Trustee as it deems appropriate, among other things. Plan Document, Article 12.01.

50.     Bank of America, N.A. is the Plan's trustee and the custodian for the majority of the Plan's investments. *See* Defined Contribution Plan Trust Agreement effective October 3, 2011 between Bank of America, N.A. and Taylor.

51.     Merrill Lynch, Pierce, Fenner & Smith Incorporated has been the recordkeeper for the Plan throughout the Class Period. *See* Forms 5500 for 2016-2020, at Schedule C.

### *Eligibility*

52.     In general, Taylor employees who are at least 21 years old are eligible to participate in the deferral portion of the Plan immediately. Employees are eligible to receive an employer matching contribution after completing six months of service, and they become eligible to receive an employer profit sharing contribution after completing one year of service. *See* Notes to Financial Statements for the year ended December 31, 2020, at 5.

### *Payment of Plan Expenses*

53.     Defendants disclose very little information to participants concerning the payment of the costs, expenses, and fees incurred in administering the Plan. The Plan Document only states: "All direct expenses of the Plan, Trustee, Plan Administrator and Investment Fiduciary or any other person in furtherance of their duties hereunder shall be paid or reimbursed by the Company, and if not so paid or reimbursed, shall be proper charges to the Trust Fund and shall be paid therefrom." Plan Document, at Section 12.05.

54.     As the Plan Document states, the Plan has discretion to charge each Plan participant for expenses of plan administration, including recordkeeping. However, the disclosures that are provided to Plan participants fail to state the actual amount of plan administrative fees and expenses that have been or will be incurred by each participant. For example, the February 2021 Participant Disclosure states:

> Plan administrative services include recordkeeping services (keeping track of participant accounts and transactions) and trustee/custodial services associated with the safekeeping of assets. Administrative services also include providing participants services such as call centers, websites, account statements and educational materials related to saving and investing for retirement.
>
> ***The Plan's service provider may receive investment-related revenue from one or more of the Plan's investments for providing the above-described administrative services.*** The Plan Sponsor and service provider have agreed upon $42.00 per participant annually to cover the cost of administrative services. These costs may or may not be charged to participant accounts on a pro rata basis (i.e., based upon a participant's account balance relative to total Plan assets) or a per capita basis (i.e., a flat fee for each participant account), as the Plan fiduciary chooses. Any charges to participant accounts may vary from year to year and based upon your Plan's rules.

> There may be other applicable Plan administrative fees and expenses arising from time to time that may be charged to participant accounts as determined by the Plan Sponsor.

Participant Disclosure of Plan and Investment Related Information (Feb. 28, 2021) (emphasis added).

55.     Thus, as disclosed above, the Plan's service provider, Merrill Lynch, may receive investment-related revenue from the investment options offered by the Plan, but the 2021 Participant Disclosure – and similar disclosures made by Defendants during the Class Period – fails to disclose the amount of such revenue sharing received by Merrill Lynch.

## VI.   THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A. The Totality of Circumstances Demonstrate That the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner

56.     As described above, Defendants were fiduciaries of the Plan.

57.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).

58.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting and monitoring the Plan's recordkeeper, because this information is solely within the possession of Defendants prior to discovery. *See Braden*, 588 F.3d at 598 ("If Plaintiffs cannot state a claim without pleading facts

which tend systematically to be in the sole possession of defendants, the remedial scheme

of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

59.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences

regarding these processes based upon the numerous factors set forth below.

### B.  ERISA's Fee Disclosure Rule

60.     In January 2012, the Department of Labor ("DOL") issued a final regulation

under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide

the responsible plan fiduciary with certain disclosures concerning fees and services

provided to certain of their ERISA governed plans. This regulation is commonly known as

the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation."[9]

61.     The required disclosures must be furnished in advance of a plan fiduciary

entering into or extending a contract or arrangement for covered services. The DOL has

stated that having this information permits a plan fiduciary to make a more informed

decision on whether or not to enter into or extend such contract or arrangement.

62.     The 408(b)(2) disclosures in short require a service provider to disclose the

services it provides and the fees it collects for such services so that sponsors can determine

the reasonableness of the arrangement.

---

[9]     *See*     *https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf*   ("DOL 408(b)(2) Regulation Fact Sheet")

63.     Plan participants, however, do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation. Here, Plaintiffs have not had access to any 408(b)(2) disclosures that may have been received by the Plan's fiduciaries.

64.     Instead, plan administrators have a separate obligation under 29 CFR § 2550.404a-5 to disclose plan-related information, including fees for certain services to participants. Among other things, fiduciaries are required to provide plan participants "[a] description of the services to which the charges relate (*e.g.*, plan administration, including recordkeeping, legal, accounting services)." 29 CFR § 2550.404a-5(C)(2)(ii)(B). These disclosures are far less detailed than the 408(b)(2) disclosures provided to plan fiduciaries, like Defendants.

### C. Costs for Recordkeeping Services Vary Little for Plans with a Substantial Number of Participants

65.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees ("RKA") are one and the same and the terms are used synonymously.

66.     It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees in order to ensure that such fees remain reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that

would have continued to grow if not taken out in fees." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 328 (3d Cir. 2019). No matter the method of payment or fee collection, the fiduciary must understand the total amount paid the recordkeeper and per-participant fees and determine whether pricing is competitive. *See Tussey*, 746 F.3d at 336. Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

67.    There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

- Recordkeeping;

- Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

- Administrative services related to converting a plan from one recordkeeper to another;

- Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

- Maintenance of an employer stock fund (if needed);

- Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

- Plan consulting services, including assistance in selecting the investment lineup offered to participants;

- Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[10] (excluding the separate fee charged by an independent third-party auditor);

- Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

- Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

68.     This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. The services chosen

---

[10]The Form 5500 is the annual report that 401(k) plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

69.    The second type of essential recordkeeping services, hereafter referred to as "*a la carte*" services, provided by all national recordkeepers, often as separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These *a la carte* services typically include, but are not limited to, the following:

- Loan processing;

- Brokerage services/account maintenance (if offered by the plan);

- Distribution services; and

- Processing of qualified domestic relations orders or "QDROs".

70.    All national recordkeepers have the capability to provide all the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

71.    The cost of providing recordkeeping services often depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. *See* 1998 DOL Study at 4.2.2 ("Basic per-participant administrative charges typically reflect

24

minimum charges and sliding scales that substantially reduce per capita costs as plan size increases."[11] Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

72.     In general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large, fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the recordkeeper **notwithstanding the level, number and character of the services provided to that additional participant.**

73.     The incremental costs caused by additional participants may include:

- mailing costs, if materials are delivered by mail versus Internet.

- telephone inquiries through a 1-800 number;

- check distributions from the 401(k) plan to the participant; and/or

- any in-person or online participant education and investment guidance requiring the personnel time of a record keepers staff member. This service is normally charged as an additional line-item cost.

74.     Although the 401(k)-participant servicing can vary slightly in the various service levels, the actual cost to a large recordkeeper with a very robust participant servicing system remains almost constant notwithstanding the level and sophistication of

---

[11] *See* https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf

participant servicing the employer has elected for his/her plan. ***Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.***

### C. Revenue Sharing Arrangements

75.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments through a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

76.    Although utilizing a revenue sharing approach is not per se imprudent, unchecked, it is extremely costly for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, *Revenue Sharing and Invisible Fees*, available at: https://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited December 28, 2021).

77.    As another industry expert noted: "If you don't establish tight control, the growth of your plan's assets over time may lead to higher than reasonable amounts getting paid to service providers. This is because most revenue sharing is asset-based. If a

recordkeeper's workload is about the same this year as last, why should they get more compensation just because the market had a big year and inflated the asset base? In a large plan, this phenomenon can lead to six figure comp bloat over time. That's bad for plan participants and bad for fiduciaries." Jim Phillips, *(b)est Practices: What Do You Know About Revenue Sharing?*, PLANSPONSOR.com (June 6, 2014).

78.     Another problem is that "revenue sharing is not equivalent among all funds; some funds pay no revenue sharing and others pay different revenue-sharing rates. The issue then arises that it may not be fair for some participants to pay a higher expense ratio because revenue sharing is built in. Another concern is that plan participants who invest in more expensive, revenue-sharing funds are bearing a disproportionate amount of the plan's administrative costs compared with their coworkers who have chosen funds without revenue sharing." Jennifer DeLong, *Coming to Grips with Excess Revenue Sharing*, Context, The AllianceBernstein Blog on Investing (June 2014). Thus, prior to the Class Period, AllianceBernstein noted, "the prevalence of revenue sharing is decreasing as more plans rethink their strategies for making plan fees more transparent." *Id*.

79.     As recognized prior to the Class Period, the best practice is a flat price based on the number of participants in a plan, which ensures that the amount of compensation paid to the recordkeeper will be tied to the actual services provided and that the recordkeeping fees will not fluctuate or change based upon, *e.g.*, an increase in assets in the plan. Indeed, in May 2014, AllianceBernstein advised: "DC plans and their fiduciaries may be better served to modify or change the plan design a bit, and it might be wise to consider removing excess revenue sharing from the picture altogether. One route to that

solution would be to consider share classes or investment vehicles with lower—or no—revenue-sharing rates." Daniel Noto, *Rethinking Revenue Sharing*, AllianceBernstein (May 2014).[12]

80.     In this case, using revenue sharing to pay for recordkeeping burdened the Plan's participants with excessive, above-market recordkeeping and administrative fees.

### D. Defendants Failed to Adequately Monitor the Plan's Recordkeeping Expenses

81.     Defendants did not adhere to fiduciary best practices to control Plan costs when looking at certain aspects of the Plan's administration such as monitoring the Plan's recordkeeping expenses.

82.     As demonstrated in the chart below, the Plan's per participant administrative and recordkeeping fees were unreasonable when benchmarked against similar plans.

| Year | Participants | Direct Comp. to Merrill Lynch | Indirect Comp. to Merrill Lynch | Total Comp. | Fees Per Participant | Fees In Excess of $35 Per Participant |
|------|--------------|-------------------------------|----------------------------------|-------------|----------------------|----------------------------------------|
| 2020 | 12,157 | $108,910.00 | $1,052,575.00 | $1,161,485.00 | $95.54 | $60.54 |
| 2019 | 12,927 | $172,113.00 | $938,344.00 | $1,110,457.00 | $85.90 | $50.90 |
| 2018 | 13,580 | $171,775.00 | $902,383.00 | $1,074,158.00 | $79.10 | $44.10 |
| 2017 | 13,360 | $172,566.00 | $951,238.00 | $1,123,804.00 | $84.12 | $49.12 |
| 2016 | 13,429 | $149,212.00 | $820,312.00 | $969,524.00 | $72.20 | $37.20 |

---

[12] Available at: https://www.alliancebernstein.com/Research-Publications/CMA-created-content/Institutional/Instrumentation/DC_RethinkingRevenueSharing.pdf (last visited Dec. 27, 2021).

83.     The excessiveness of the Plan's recordkeeping and administrative expenses in the above chart is readily apparent when compared to the amount similar plans have paid for recordkeeping and administrative costs.

84.     Defendants claim that Merrill Lynch agreed to a fee of $42.00 per participant to "cover the cost of administrative services." *See* Participant Disclosure of Plan and Investment Related Information (Feb. 28, 2021). However, as shown in the chart above, the Plan's per participant recordkeeping fees averaged **$83.37** during the Class Period. There is no indication in the Plan's 5500s, auditor's reports, or Participant Fee Disclosures that the Plan ever received rebates of the recordkeeping fees in excess of $42.00 per participant.

85.     From the years 2016 through 2020, based upon the information available to Plaintiffs, which was equally or even more easily available to Defendants during the Class Period, it was possible for the Plan to negotiate recordkeeping fees for not more than between $20 and $35 per participant.

86.     The table below illustrates that the annual recordkeeping fees to recordkeepers by comparable plans of similar sizes of assets under management in 2018, compared to the average annual recordkeeping fees paid by the Plan (as identified in the table above).

| Comparable Plans' RK&A Fees from Recordkeepers in 2018[13] | | | | | |
|---|---|---|---|---|---|
| Plan | Participants | Net Assets | Recordkeeping Fees | Per Participant Fee | Recordkeeper |
| **Taylor Companies 401(k) and Profit Sharing Plans** | **13,580** | **$684,276,899** | **$1,074,158** | **$79.10** | **Merrill Lynch** |
| Sutter Health Retirement Income Plan | 13,248 | $448,119,989 | $460,727 | $35 | Fidelity |
| Fortive Retirement Savings Plan | 13,502 | $1,603,610,831 | $472,673 | $35 | Fidelity |
| The Tax Sheltered Annity Plan of Texas Children's Hospital | 13,950 | $993,649,270 | $416,395 | $30 | Fidelity |
| DHL Retirement Savings Plan | 14,472 | $806,883,596 | $483,191 | $33 | Fidelity |
| Dollar General Corp. 401(k) Savings and Retirement Plan | 19,118 | $355,768,325 | $349,756 | $18 | Voya |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $930,019 | $30 | Alight Financial |
| The Savings and Investment Plan | 34,303 | $2,682,563,818 | $1,130,643 | $33 | Vanguard |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 47,358 | $3,104,524,321 | $1,298,775 | $27 | Vanguard |
| Sutter Health 403(B) Savings Plan | 73,358 | $3,681,162,013 | $1,908,133 | $26 | Fidelity |

---

[13] Price calculations are based on Form 5500 information filed by the respective plans for the year 2018, if available or more recent year if not available.

2.      **Market Surveys, Form 5500s and other Sources Are a Reliable Source for Participants to Determine Whether the Plan's Recordkeeping Fees Are Unreasonable**

87.      In 2014, NEPC, LLC, a consulting group, reported a significant reduction in median administrative fees to $70 per participant. In 2016, NEPC, LLC reported that for individual account plans with $1 billion in assets, administrative fees had dropped to $37 per participant.

88.      More recently, NEPC conducted its 14th Annual Survey titled the NEPC 2019 Defined Contribution Progress Report (referenced above) which took a survey of various defined contribution plan fees.[14] The sample size and respondents included 121 Defined Contribution Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other. The average plan had $1.1 billion in assets and 12,437 participants. The median plan had $512 million in assets and 5,440 participants. *See* Report at 1.

89.      NEPC's survey found that plans with over 15,000 participants paid on average $40 or less in per participant recordkeeping, trust and custody fees. *See* Report at 10.

90.      The Plan's total recordkeeping costs are clearly unreasonable as numerous authorities have recognized that reasonable rates for large plans typically average around $35 per participant, with costs coming down every day.[15]

---

[14] Available at https://www.nepc.com/insights/2019-dc-plan-and-fee-survey.

[15] Case law is in accord that large plans can bargain for low recordkeeping fees. *See*, *e.g.*, *Spano v. Boeing*, No. 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate

91.     For example, in 2020, following extensive review and negotiation, the University of Chicago ERISA fiduciaries reduced annual recordkeeping fees on their two 403(b) plans to $21-$44 per participant. Another example is Fidelity – a recordkeeper for hundreds of plans – which recently stipulated in a lawsuit that a plan with tens of thousands of participants and over a billion dollars in assets could command recordkeeping fees as low as $14-21 per person per year. *See Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 204 (D. Mass. Mar. 27, 2020).

92.     Specifically, Fidelity stipulated as follows:

> The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that ***Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year***. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. ***The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).***

*Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2 (emphasis added).

---

of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George* v. *Kraft Foods Glob., Inc.*, 641 F.3d 786, 798 (7th Cir. 2011) (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, No. 13-30184, Doc. 107-2 at ¶10.4 (D. Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

93.    The significance of the Fidelity stipulation is that the Plan's demographics matches favorably with the Fidelity plan's demographics demonstrating the Plan fiduciaries could have negotiated for RKA fees as low $14 and up to $21 per participant.

94.    In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

95.    Further, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *See George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (the plan's consultant stated that "without an actual fee quote comparison," *i.e.*, a bid from another service provider, it could not comment on the reasonableness of fee amounts for

the services provided); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015); *see also* NEPC 2019 Defined Contribution Progress Report at 10 (the "Best Practice" is to compare fees and services through a record keeping vendor search Request for Proposal process).

96.    Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years." These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[16]

97.    Generally, any RFPs, if conducted, would not be made available to plan participants. The same is true for Plaintiffs here who do not have direct access to such information.

98.    Additionally, documentation of fiduciary reviews is generally accomplished in the form of meeting minutes. These minutes do not necessarily need to be lengthy, but they should describe the (i) fiduciary topics discussed, (ii) type of investment information considered for the fiduciary review, and (iii) the rationale for resulting investment decisions. Any related documents or data considered for purposes of the investment review (*e.g.*, prospectuses, plan investment reports, market data, etc.) should be included as attachments to the meeting minutes or otherwise memorialized. Without proper

---

[16] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/

documentation of the investment decision-making process, plan fiduciaries are open to the charge that their decisions were made in an imprudent or conflicted manner.

99.    In an attempt to discover the details of the Plan's mismanagement, on June 14, 2021, Plaintiffs wrote to the Plan administrator requesting, *inter alia*, meeting minutes from the Committee. By correspondence dated July 14, 2021, the Plan administrator denied this request.

100.    Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

101.    In short, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments or monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of

defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

102.    For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these fiduciary processes based upon information available to Plaintiffs, such as Rule 404a disclosures, Form 5500s filed with the DOL, market surveys, and other authority.

103.    While the Plan has stayed with the same recordkeeper over the course of the Class Period and paid the same relative amount in recordkeeping fees, there is nothing to suggest that Defendants conducted a RFP at reasonable intervals – or certainly at any time from 2016 through the present – to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with numerous vendors equally capable of providing a high-level service.

### 2020 TOP PROVIDERS (RECORDKEEPERS)

**Top 10, by Total 401(k) Assets ($MM)**

| | | |
|---|---|---|
| 1 | Fidelity Investments | $2,037,733 |
| 2 | Empower Retirement | $493,577 |
| 3 | The Vanguard Group | $454,223 |
| 4 | Alight Solutions | $434,737 |
| 5 | Principal Financial Group | $322,976 |
| 6 | Voya Financial | $211,389 |
| 7 | T. Rowe Price | $195,224 |
| 8 | Prudential Financial, Inc. | $180,544 |
| 9 | Bank of America Corporation | $173,412 |
| 10 | Charles Schwab | $162,876 |

104.    At any point in the Class Period, the Plan's fiduciaries could have opted to conduct an RFP including any of the above recordkeepers, which are peers of Merrill Lynch and capable of providing lower recordkeeping fees.

105.    The recordkeepers in the top ten are all capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena.

106.    Given the size of the Plan's assets during the Class Period, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost. Moreover, at any point in the Class Period, Defendants could have conducted an RFP to obtain comparable recordkeeping services for lower fees.

### E.  Many of the Plan's Funds Had Investment Management Fees in Excess of Fees for Funds in Similarly Sized Plans

107.    Another indication that Defendants employed a flawed fiduciary process is their failure to prudently select and monitor the Plan's investment options during the Class Period.

108.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

109.    As shown below, many of the Plan's investments were significantly more expensive than comparable funds found in similarly sized plans (*i.e.*, plans having between $500 million and $1 billion in assets).

110.    As noted above, the Committee selects the various investment options made available to Plan participants. The following options were available to Plan participants as of December 31, 2020:

| TICKER | FUND NAME | VALUE | EXPENSE RATIO |
|---|---|---|---|
| RERFX | American EuroPacific Growth Fund R5 | $ 38,816,383 | 0.51 % |
| CSRSX | Cohen & Steers Realty Shares Class N | $ 8,556,597 | 0.96 % |
| NMPAX | Columbia Mid Cap Index Fund Class I | $ 39,895,048 | 0.33 % |
| NMSCX | Columbia Small Cap Index Class I | $ 11,373,966 | 0.20 % |
| OIERX | JPMorgan Equity Income Fund Class R5 | $ 27,605,286 | 0.58 % |
| EISMX | Eaton Vance Atlanta Capital SMID Cap Fund Class I | $ 28,606,905 | 0.92 % |
| FSSAX | Franklin Small Cap Growth Fund Advisor Class | $ 19,081,101 | 0.83 % |
| GSIPX | Goldman Sachs Inflation Protected Securities Fund I | $ 9,556,381 | 0.41 % |
| MWTIX | Metropolitan West Total Return Bond Fund I | $ 68,240,679 | 0.46 % |
| TRRFX | T. Rowe Price Retirement 2005 Inv. Class | $ 140, 000 | 0.52 % |
| TRRAX | T. Rowe Price Retirement 2010 Inv. Class | $ 835,906 | 0.52 % |
| TRRGX | T. Rowe Price Retirement 2015 Inv. Class | $ 5,935,571 | 0.55 % |
| TRRBX | T. Rowe Price Retirement 2020 Inv. Class | $ 22,472,549 | 0.57 % |
| TRRHX | T. Rowe Price Retirement 2025 Inv. Class | $ 83,705,694 | 0.61 % |
| TRRCX | T. Rowe Price Retirement 2030 Inv. Class | $ 40,917,166 | 0.64 % |
| TRRJX | T. Rowe Price Retirement 2035 Inv. Class | $ 50,836,533 | 0.67 % |
| TRRDX | T. Rowe Price Retirement 2040 Inv. Class | $ 19,919,961 | 0.69 % |
| TRRKX | T. Rowe Price Retirement 2045 Inv. Class | $ 40,341,070 | 0.71 % |
| TRRMX | T. Rowe Price Retirement 2050 Inv. Class | $ 9,516,030 | 0.71 % |
| TRRNX | T. Rowe Price Retirement 2055 Inv. Class | $ 7,636,722 | 0.71 % |
| TRRLX | T. Rowe Price Retirement 2060 Inv. Class | $ 2,112,832 | 0.71 % |
| TRRIX | T. Rowe Price Retirement Balanced Inv. Class | $ 3,252,499 | 0.50 % |
| EMRIX | Van Eck Emerging Markets | $ 2,945,361 | 1.16 % |
| VSVIX | Victory Integrity Small Cap Value Fund Class Y | $ 5,716,331 | 1.11 % |
| WFMIX | Wells Fargo Special Mid Cap Value Fund Institutional Class | $ 14,126,954 | 0.82 % |
| -- | Northern Trust S&P 500 Index Fund DC Non-Lending Tier 3 | $ 138,157,198 | 0.02 % |
| -- | Principal Global Investors Morley Stable Value 25a | $ 72,132,845 | 0.46 % |
| -- | Winslow Large Cap Growth I20 | $ 87,151,081 | 0.75 % |

111.   If a participant fails to make any investment allocations, their personal contributions and any matching contributions will be invested in the Plan's qualified default investment alternative ("QDIA"), which has been selected by the Plan's fiduciaries. The applicable QDIA for any Plan participant who does not provide instructions on how to invest their savings is one of the T. Rowe Price age-based funds. The applicable T. Rowe Price Retirement date fund is determined based on the participant's date of birth.

112.   In January 2012, the DOL issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans. This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation."[17]

113.   The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

114.   As stated by the DOL, ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only

---

[17]   *See*   https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf   ("DOL 408(b)(2) Regulation Fact Sheet").

'reasonable' compensation is paid for services. Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers." DOL 408(b)(2) Regulation Fact Sheet, at 1.

115.    Investment options have a fee for investment management and other services. With regard to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio that is based on a percentage of assets. For example, an expense ratio of 0.75% means that the plan participant will pay $7.50 annually for every $1,000 in assets. However, the expense ratio also reduces the participant's return and the compounding effect of that return. This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

116.    "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." *Best Practices for Plan Fiduciaries*, at 36, published by Vanguard (2019).[18]

117.    For purposes of evaluating expense ratios of an investment, plan fiduciaries should obtain competitive pricing information (*i.e.*, fees charged by other comparable investment funds to similarly situated plans). This type of information can be obtained through mutual fund data services, such as Morningstar, or with the assistance of the plan's expert consultant. However, for comparator information to be relevant for fiduciary

---

[18] Available at
https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

purposes, it must be consistent with the size of the plan and its relative bargaining power. Large plans for instance are able to qualify for lower fees on a per participant basis, and comparators should reflect this fact.

118.   According to Vanguard, "[b]enchmarking is one of the most widely used supplements to fee disclosure reports and can help plan sponsors put into context the information contained in the reports." *Best Practices for Plan Fiduciaries*, at 37.

119.   "The use of third-party studies provides a cost-effective way to compare plan fees with the marketplace. Plan sponsors may elect to engage a consultant to assist in the benchmarking process. For a fee, consultants can give plan sponsors a third-party perspective on quality and costs of services. It is important to understand the plan (*e.g.*, plan design, active or passive investment management, payroll complexities, etc.) as it relates to the benchmarking information in order to put the results in an appropriate context. By understanding all of the fees and services, a plan sponsor can make an accurate 'apples-to-apples' comparison." *Id.*

120.   Here, the Defendants could not have engaged in a prudent process as it relates to evaluating investment management fees. The Plan would have qualified for the collective trust ("CIT") versions of these funds, which are akin to lower cost institutional share classes, at all times during the Class Period. However, Defendants imprudently failed to consider the lower cost CIT versions of the T. Rowe Price funds (which were available since 2012), and they failed to move these investments to the CIT versions of these funds.

121.   Two of the Plan's index funds, the Columbia Mid Cap Index Institutional Fund and the Columbia Small Cap Index Institutional Fund, have expense ratios that are

**725%** and **400%** above their respective ICI *medians* for their fund categories.[19] Another Plan investment option, the Victory Integrity Small-Cap Value Class Y Fund, which underperformed its benchmark index (as detailed in **Section E** below), has an expense ratio that is **246.88%** above the ICI median for its fund category. Other overpriced investment offerings include Franklin Small Cap Growth Adv. Fund and the Wells Fargo Special Mid Cap Value Institutional Fund have expense ratios that are **159.38%** and **156.25%**, respectively, above the ICI medians for their fund categories. These excessively high expense ratios are detailed in the chart below:

---

[19] The BrightScope/ICI study data cited in this Complaint can be found in the *BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401K Plans, 2017*, at p. 67 (Aug. 2020); https://www.ici.org/system/files/attachments/20_ppr_dcplan_profile_401k.pdf.

**ICI MEDIAN & AVERAGE EXPENSE RATIOS FOR
PLANS WITH $500 MILLION TO $1 BILLION**

| Current In-Plan Fund | 2021 Expense Ratio | Investment Style | ICI Median | Excess over Median |
|---|---|---|---|---|
| American Funds Europacific Growth R5 | 0.51 % | Int'l Equity | 0.49 % | 4.08 % |
| Cohen & Steers Realty Shares | 0.96 % | Other | 0.75 % | 28.00 % |
| Columbia Mid Cap Index Inst | 0.33 % | Index | 0.04 % | 725.00 % |
| Columbia Small Cap Index Inst | 0.20 % | Index | 0.04 % | 400.00 % |
| Franklin Small Cap Growth Adv | 0.83 % | Domestic Equity | 0.32 % | 159.38 % |
| JPMorgan Equity Income R5 | 0.58 % | Domestic Equity | 0.32 % | 81.25 % |
| Metropolitan West Total Return Bd I | 0.46 % | Domestic Bond | 0.39 % | 17.95 % |
| Nuveen Winslow Large-Cap Growth I | 0.75 % | Domestic Equity | 0.32 % | 134.38 % |
| T. Rowe Price Retirement 2005 | 0.52 % | Target-Date | 0.40 % | 30.00 % |
| T. Rowe Price Retirement 2010 | 0.52 % | Target-Date | 0.40 % | 30.00 % |
| T. Rowe Price Retirement 2015 | 0.55 % | Target-Date | 0.40 % | 37.50 % |
| T. Rowe Price Retirement 2020 | 0.57 % | Target-Date | 0.40 % | 42.50 % |
| T. Rowe Price Retirement 2025 | 0.61 % | Target-Date | 0.40 % | 52.50 % |
| T. Rowe Price Retirement 2030 | 0.64 % | Target-Date | 0.40 % | 60.00 % |
| T. Rowe Price Retirement 2035 | 0.67 % | Target-Date | 0.40 % | 67.50 % |
| T. Rowe Price Retirement 2040 | 0.69 % | Target-Date | 0.40 % | 72.50 % |
| T. Rowe Price Retirement 2045 | 0.71 % | Target-Date | 0.40 % | 77.50 % |
| T. Rowe Price Retirement 2050 | 0.71 % | Target-Date | 0.40 % | 77.50 % |
| T. Rowe Price Retirement 2055 | 0.71 % | Target-Date | 0.40 % | 77.50 % |
| T. Rowe Price Retirement 2060 | 0.71 % | Target-Date | 0.40 % | 77.50 % |
| T. Rowe Price Retirement Balanced | 0.50 % | Target-Date | 0.40 % | 25.00 % |
| Van Eck Emerging Markets I | 1.16 % | Int'l Equity | 0.49 % | 136.73 % |
| Victory Integrity Small-Cap Value Y | 1.11 % | Domestic Equity | 0.32 % | 246.88 % |
| Wells Fargo Special Mid Cap Value Inst | 0.82 % | Domestic Equity | 0.32 % | 156.25 % |

122.    As shown above, the T. Rowe Price Retirement Date Funds have expense ratios that exceed their respective ICI medians by as much as 77.5% for the 2045-2060 funds. As of December 31, 2020, the Plan's participants had invested approximately $284,230,034 in the T. Rowe Price Retirement Date Funds, which represented more than 32% of the Plan's total assets.

123.    Had Defendants simply switched from the mutual fund versions of the T. Rowe Price Target Date funds to the collective investment trust versions of such funds (for which the Plan qualified at all times during the Class Period), Plaintiffs and the Class would have benefited from substantially lower expense ratios for the exact same investment options, as detailed in the chart below:

### ICI MEDIAN EXPENSE RATIOS FOR PLANS WITH $500 MILLION TO $1 BILLION

| CURRENT IN-PLAN FUND | 2019 EXPENSE RATIO | INVESTMENT STYLE | ICI MEDIAN |
|---|---|---|---|
| T. ROWE PRICE AGE BASED RETIREMENT INCOME TRUST F - 2010 | 0.43% | TARGET-DATE | 0.40 % |
| T. ROWE PRICE AGE BASED RETIREMENT INCOME TRUST F - 2015 | 0.43% | TARGET-DATE | 0.40 % |
| T. ROWE PRICE AGE BASED RETIREMENT INCOME TRUST F - 2020 | 0.43% | TARGET-DATE | 0.40 % |
| T. ROWE PRICE AGE BASED RETIREMENT INCOME TRUST F - 2025 | 0.43% | TARGET-DATE | 0.40 % |
| T. ROWE PRICE AGE BASED RETIREMENT INCOME TRUST F - 2030 | 0.43% | TARGET-DATE | 0.40 % |
| T. ROWE PRICE AGE BASED RETIREMENT INCOME TRUST F - 2035 | 0.43% | TARGET-DATE | 0.40 % |
| T. ROWE PRICE AGE BASED RETIREMENT INCOME TRUST F - 2040 | 0.43% | TARGET-DATE | 0.40 % |

| T. ROWE PRICE AGE BASED RETIREMENT INCOME TRUST F - 2045 | 0.43% | TARGET-DATE | 0.40 % |
|---|---|---|---|
| T. ROWE PRICE AGE BASED RETIREMENT INCOME TRUST F - 2050 | 0.43% | TARGET-DATE | 0.40 % |
| T. ROWE PRICE AGE BASED RETIREMENT INCOME TRUST F - 2055 | 0.43% | TARGET-DATE | 0.40 % |
| T. ROWE PRICE AGE BASED RETIREMENT INCOME TRUST F - 2060 | 0.43% | TARGET-DATE | 0.40 % |

124.    Given the excessive costs of the T. Rowe Price Target Date funds, they should have been replaced by the start of the Class Period, but to date, Defendants have failed to do so.

### F. Defendants Breached Their Fiduciary Duties by Selecting More Expensive Share Classes Instead of the Lowest-Cost Institutional Shares of Same Funds

125.    Many of the mutual funds offered in the Plan have several classes of shares that are targeted at different types investors. The more expensive share classes are sold to individual investors who have less bargaining power, while lower cost shares are sold to institutional investors with more assets and, therefore, greater bargaining power. There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

126.    Large 401(k) plans, like the Plan, have sufficient assets to qualify for the lowest-cost share class available. Even when a retirement plan does not meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan willing to add the fund to its menu of designated

investment options. Thus, a fiduciary of a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available. For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

127.    The availability of lower-cost institutional class shares for large defined benefit plans has been widely known throughout the Class Period. For instance, a February 2016 article by the head of a fiduciary consulting firm described the failure to investigate the availability of and subsequently utilize the lowest-cost share class as an "egregious fiduciary breach[]" that is responsible for "[w]asting plan assets" in a manner that is "clearly imprudent." Blaine Aikin, *Recent Class-Action Surge Ups the Ante for 401(k) Advice*, InvestmentNews (Feb. 18, 2016).[20]

128.    As one court observed, "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble*, *v. Edison Int.*, No. 07-5359, slip op. at 13 (C.D. Cal. Aug. 16, 2017).

---

[20] Available at: https://www.investmentnews.com/recent-class-action-surge-ups-the-ante-for-401k-advice-66056 (last visited July 2, 2020).

129.    Thus, it is incumbent upon large plan fiduciaries, like Defendants, to select the lowest-cost class of shares that is available to the Plan.

130.    As demonstrated by the chart below, in several instances during the Class Period, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds, which are identical to the mutual funds in the Plan in every way except for their lower cost. The chart below uses 2021 expense ratios, the most recent data available, to demonstrate how much more expensive the share classes in the Plan were than available lower-cost share classes.

| FUND SHARE CLASS IN PLAN (ticker/assets/fund name) | EXPENSE RATIO[21] | LOWER-COST SHARE CLASS (ticker/fund name) | EXPENSE RATIO | Excess Cost |
|---|---|---|---|---|
| TRRFX $222,750 **T. Rowe Price Retirement 2005** | 0.52 % | TRPFX **T. Rowe Price Retirement 2005 I** | 0.34 % | 52.94 % |
| TRRAX $818,438 **T. Rowe Price Retirement 2010** | 0.52 % | TRPAX **T. Rowe Price Retirement 2010 I** | 0.34 % | 52.94 % |
| TRRGX $6,531,576 **T. Rowe Price Retirement 2015** | 0.55 % | TRFGX **T. Rowe Price Retirement 2015 I** | 0.40 % | 37.50 % |
| TRRBX $22,196,742 **T. Rowe Price Retirement 2020** | 0.57 % | TRBRX **T. Rowe Price Retirement 2020 I** | 0.42 % | 35.71 % |
| TRRHX $67,734,238 **T. Rowe Price Retirement 2025** | 0.61 % | TRPHX **T. Rowe Price Retirement 2025 I** | 0.46 % | 32.61 % |
| TRRCX $27,168,752 **T. Rowe Price Retirement 2030** | 0.64 % | TRPCX **T. Rowe Price Retirement 2030 I** | 0.49 % | 30.61 % |

---

[21] Expense ratios reported in the Participant Disclosure of Plan and Investment Related Information as of January 31, 2021.

| FUND SHARE CLASS IN PLAN (ticker/assets/fund name) | EXPENSE RATIO | LOWER-COST SHARE CLASS (ticker/fund name) | EXPENSE RATIO | Excess Cost |
|---|---|---|---|---|
| TRRJX $35,439,079 **T. Rowe Price Retirement 2035** | 0.67 % | TRPJX **T. Rowe Price Retirement 2035 I** | 0.50 % | 34.00 % |
| TRRDX $13,576,769 **T. Rowe Price Retirement 2040** | 0.69 % | TRPDX **T. Rowe Price Retirement 2040 I** | 0.51 % | 35.29 % |
| TRRKX $27,318,884 **T. Rowe Price Retirement 2045** | 0.71 % | TRPKX **T. Rowe Price Retirement 2045 I** | 0.51 % | 39.22 % |
| TRRMX $5,491,373 **T. Rowe Price Retirement 2050** | 0.71 % | TRPMX **T. Rowe Price Retirement 2050 I** | 0.52 % | 36.54 % |
| TRRNX $4,343,919 **T. Rowe Price Retirement 2055** | 0.71 % | TRPNX **T. Rowe Price Retirement 2055 I** | 0.46 % | 54.35 % |
| TRRLX $516,527 **T. Rowe Price Retirement 2060** | 0.71 % | TRPLX **T. Rowe Price Retirement 2060 I** | 0.46 % | 54.35 % |
| TRRIX $2,510,324 **T. Rowe Price Retirement Balanced** | 0.50 % | TRPTX **T. Rowe Price Retirement Balanced I** | 0.34 % | 47.06 % |
| RERFX $28,831,865 **American Funds EuroPacific Growth R5** | 0.51 % | RERGX **American Funds EuroPacific Growth R6** | 0.46 % | 10.87 % |
| *CIT* $37,613,788 **Columbia Mid Cap Index** | 0.33 % | NMPAX **Columbia Mid Cap Index I** | 0.20 % | 65.00 % |
| EISMX $28,606,905 **Eaton Vance Atlanta Capital SMID-CAP I** | 0.92 % | ERASX **Eaton Vance Atlanta Capital SMID-CAP R6** | 0.82 % | 12.20 % |
| FSSAX $12,050,262 **Franklin Small Cap Growth Adv** | 0.82 % | FSMLX **Franklin Small Cap Growth R6** | 0.66 % | 24.24 % |
| GSIPX $6,517,663 **Goldman Sachs Inflation Protected Secs Instl.** | 0.34 % | GSRUX **Goldman Sachs Inflation Protected Securities Fund R6** | 0.33 % | 3.03 % |

| FUND SHARE CLASS IN PLAN (ticker/assets/fund name) | EXPENSE RATIO | LOWER-COST SHARE CLASS (ticker/fund name) | EXPENSE RATIO | Excess Cost |
|---|---|---|---|---|
| OIERX $26,327,518 **JPMorgan Equity Income R5** | 0.57 % | OIEJX **JPMorgan Equity Income R6** | 0.47 % | 21.28 % |
| MWTIX $53,363,196 **Metropolitan West Total Return Bd I** | 0.46 % | MWTSX **Metropolitan West Total Return Bd Plan Class** | 0.38 % | 21.05 % |
| VSVIX $5,557,247 **Victory Integrity Small-Cap Value Y** | 1.11 % | MVSSX **Victory Integrity Small-Cap Value R6** | 0.97 % | 14.43 % |
| WFMIX $8,702,171 **Wells Fargo Special Mid Cap Value Inst.** | 0.81 % | WFPRX **Wells Fargo Special Mid Cap Value R6** | 0.71 % | 14.08% |
| **CIT** $57,512,886 **Winslow Large-Cap Growth I20** | 0.75 % | NWCFX **Winslow Large-Cap Growth R6** | 0.51 % | 47.06% |

131.     As the chart above illustrates, throughout the Class Period Defendants should have known of the existence and availability of lower-cost share classes, and they should have promptly transferred the Plan's investments in such funds to these less expensive share classes, however, with respect to at least **23 funds**, Defendants failed to do so. These less expensive share classes were available to be selected by the Plan's fiduciaries no later than the beginning of the Class Period. Defendants' failure to select the lowest-cost share class available caused Plan participants to pay excessive fees, which has and will continue to diminish the value of their individual 401(k) accounts.

132.     Qualifying for lower share classes usually requires a minimum of a million dollars for individual funds. As demonstrated in the table above, all but 3 of the funds had more than $1 million in assets (most had substantially more), and therefore, the Plan would have easily qualified for lowest share classes for these funds. With respect to the 3 funds

that had less than $1 million in assets, the Plan nonetheless satisfied the minimum investment requirements for the lower cost share class.

133.    A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into institutional shares at the earliest opportunity. Yet, despite the availability of lower-cost shares, Defendants did not transfer Plan holdings in any of these funds from higher-priced share classes into the lowest-cost institutional share classes, in breach of their fiduciary duties.

134.    There is no good-faith explanation for selecting and retaining a high-cost share class when a lower-cost share class is available for the exact same investment. The Plan did not receive any additional services or benefits based on its selection of more expensive share classes; the only consequence was higher costs for Plan participants.

### G. Defendants Retained at Least One Underperforming Fund in the Plan from 2016 to 2020

135.    In addition to the foregoing, another indication of Defendants' lack of a prudent process to monitor Plan funds and expenses during the Class Period was their failure to remove the Victory Integrity Small Cap Value Fund Class Y (Ticker: VSVIX), which has an expense ratio of 1.11 percent, and consistently underperformed both its benchmark Morningstar US Small Brd Val Ext TR USD index and lower-cost funds in the same fund category that measured their performance against the same benchmark index.

136.    The Victory Integrity Small Cap Value Fund Class Y underperformed as follows as of September 30, 2021:

| FUND | NET EXPENSE RATIO | AVERAGE ANNUAL RETURN (%) | | |
|---|---|---|---|---|
| | | **3Y** | **5Y** | **10Y** |
| **VSVIX** **VICTORY INTEGRITY SMALL CAP VALUE FUND CLASS Y** | **1.11%** | 7.32 | 10.13 | 12.96 |
| Benchmark Relative Performance (Morningstar Us Small Brd Val Ext Tr USD) | | 8.42 | 10.31 | 13.51 |
| | | | | |
| **MVSSX** **VICTORY INTEGRITY SMALL-CAP VALUE R6** | **0.96%** | 7.47 | 10.31 | 13.09 |
| Benchmark Relative Performance (Morningstar US Small Brd Val Ext TR USD) | | 8.42 | 10.31 | 13.51 |
| | | | | |
| **VSIIX** **Vanguard Small Cap Value Index I** | **0.06%** | 8.89 | 11.06 | 14.22 |
| Benchmark Relative Performance (Morningstar US Small Brd Val Ext TR USD) | | 8.42 | 10.31 | 13.51 |
| | | | | |
| **DFFVX** **DFA US Targeted Value I** | **0.33%** | 9.34 | 11.35 | 14.02 |
| Benchmark Relative Performance (Morningstar US Small Brd Val Ext TR USD) | | 8.42 | 10.31 | 13.51 |

137.    As detailed in the chart above, the less expensive R6 Class version of the Victory Integrity Small Cap Value Fund outperformed the Y Class version of the fund over the critical 3-, 5-, and 10-year periods as of September 30, 2021. However, there were even

better performing, lower cost alternatives in the same fund category, which tracked their performance by the same benchmark index. A prudent fiduciary should have been aware of better preforming lower-cost alternatives and replaced the Victory Integrity Small Cap Value Fund Class Y with a lower-cost, better performing alternative. Defendants' failure to do so is a clear indication that the Plan lacked a prudent process for monitoring the cost and performance of the funds in the Plan.

138.    Given the clear underperformance of the Victory Integrity Small Cap Value Fund Class Y relative to its benchmark during the last ten years, and its above-median and average expense ratio, it should have been replaced during the Class Period.

## FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duty of Prudence
### (Asserted Against the Committee)

139.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

140.    At all relevant times, Defendants Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

141.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the

circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

142.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of the Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.

143.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had the Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

144.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence/Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for the Prudence Defendants' breaches, as set forth in their Prayer for Relief.

145.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under

the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted Against Taylor and the Board)**

146.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

147.    The Board Defendants and Taylor (the "Monitoring Defendants") had the authority and obligation to monitor the Committee and was aware that the Committee had critical responsibilities as a fiduciary of the Plan.

148.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee and ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

149.    The Monitoring Defendants also had a duty to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

150.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)     Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions;

(b)     failing to monitor the processes by which the Plan's investments were evaluated; and

(c)     failing to remove the Committee as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

151.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

152.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA

fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce

the provisions of ERISA as may be appropriate, including appointment of an independent

fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have

breached their fiduciary duties;

I.       An award of pre-judgment interest;

J.       An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common

fund doctrine; and

L.       Such other and further relief as the Court deems equitable and just.


Date:  January 11, 2023                 */s/ David A. Goodwin*
                                        Daniel E. Gustafson (#202241)
                                        Daniel C. Hedlund (#258337)
                                        David A. Goodwin (#0386715)
                                        Tony J. Stauber (#0401093)
                                        **GUSTAFSON GLUEK PLLC**
                                        Canadian Pacific Plaza
                                        120 South Sixth Street, Suite 2600
                                        Minneapolis, MN 55402
                                        Telephone: (612) 333-8844
                                        Facsimile: (612) 339-6622
                                        dgustafson@gustafsongluek.com
                                        dhedlund@gustafsongluek.com
                                        dgoodwin@gustafsongluek.com
                                        tstauber@gustafsongluek.com

                                        Eric Lechtzin, Esquire (*admitted pro hac vice*)
                                        Marc H. Edelson, Esquire (*admitted pro hac vice*)
                                        **EDELSON LECHTZIN LLP**

411 S. State Street, Suite N-300
Newtown, PA 18940
Telephone: (215) 867-2399
Facsimile: (267) 685-0676
elechtzin@edelson-law.com
medelson@edelson-law.com

Mark K. Gyandoh, Esquire (*admitted pro hac vice*)
**APOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
(610) 890-0200
Fax (717) 233-4103
markg@capozziadler.com

Donald R. Reavey, Esquire (*admitted pro hac vice*)
2933 North Front Street
Harrisburg, PA 17110
(717) 233-4101
Fax (717) 233-4103
donr@capozziadler.com

***Counsel for Plaintiffs and the Putative Class***