UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Jason C. Fritton, Marea Gibson, Brian W.
Motzenbeeker, Dawn Duff, and Christopher
Shearman, *individually and on behalf of all
others similarly situated*,

        Plaintiffs,

v.

Taylor Corporation, the Board of Directors
of Taylor Corporation, the Fiduciary
Investment Committee, and John Does 1–
30,

        Defendants.

File No. 22-cv-00415 (ECT/TNL)

**OPINION AND ORDER**

---

Eric Lechtzin, Edelson Lechtzin LLP, Huntingdon Valley, PA; Marc H. Edelson, Edelson
Lechtzin LLP, Newton, PA; Daniel E. Gustafson, Daniel C. Hedlund, David A. Goodwin,
and Anthony Stauber, Gustafson Gluek PLLC, Minneapolis, MN; Mark K. Gyandoh,
Capozzi Adler, PC, Merion Station, PA; and Donald R. Reavey, Capozzi Adler, PC,
Harrisburg, PA, for Plaintiffs Jason C. Fritton, Marea Gibson, Brian W. Motzenbeeker,
Dawn Duff, and Christopher Shearman.

Emily S. Costin, Alston & Bird LLP, Washington, DC; Richard Blakeman Crohan and
Margaret Ellen Studdard, Alston & Bird LLP, Atlanta, GA; and Steven C. Kerbaugh, Saul
Ewing Arnstein & Lehr, LLP, Minneapolis, MN, for Defendants Taylor Corporation, the
Board of Directors of Taylor Corporation, and the Fiduciary Investment Committee.

---

Plaintiffs claim that their former employer, Taylor Corporation, its Board of

Directors, Fiduciary Investment Committee, and every individual who served as a director

or Fiduciary Investment Committee member during the relevant period, all violated ERISA

by mismanaging the corporation's defined-contribution 401(k) and profit-sharing plan (the

"Plan"). Plaintiffs allege that Defendants breached their fiduciary duties by authorizing

the Plan to pay unreasonably high recordkeeping fees, allowing the Plan's investment portfolio to include options with unreasonably high management fees and needlessly expensive share classes, and allowing the Plan to retain an underperforming fund.

Defendants seek dismissal of the Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). This is the second round of Rule 12 motions. In the first round, the Complaint was dismissed for a combination of jurisdictional- and merits-based reasons. *Fritton v. Taylor Corp.*, No. 22-cv-415 (ECT/TNL), 2022 WL 17584416 (D. Minn. Dec. 12, 2022). Familiarity with the December 12 order is presumed here.

In a nutshell, Defendants argue that Plaintiffs do not allege plausible ERISA claims based on their excessive-recordkeeping-expenses, excessive-management-fees, and excessive-share-class theories. With these three theories out, Defendants argue that Plaintiffs lack Article III standing to pursue their single-underperforming-fund theory and that, regardless, this theory too is implausible.

Defendants' motion will be granted for the most part, but not entirely. (I) Plaintiffs' excessive-recordkeeping-expenses theory continues to suffer from the same problem that prompted dismissal in the first motion-to-dismiss round: Plaintiffs do not allege facts plausibly showing that the Plan's recordkeeping fees are unreasonably high. (II) Though the question is the subject of some disagreement among the federal courts, I conclude that Plaintiffs' excessive-management-fees theory fails largely because as this theory is pleaded, a collective investment trust is not a plausible benchmark for a mutual fund. (III) Plaintiffs' expensive-share-class theory is plausible. The arguments Defendants advance to challenge this theory depend on construing the Amended Complaint's relevant

2

allegations against Plaintiffs.  That would be improper.  (IV) Plaintiffs' single-underperforming-fund theory will be dismissed because the benchmarks alleged to support this theory are implausible.  (V) Plaintiffs' duty-of-loyalty claim—barely mentioned in the Amended Complaint—is not plausible.  (VI) Because the expensive-share-class theory survives, so does Plaintiffs' derivative failure-to-monitor claim.

*

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted).  Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  The complaint must "state a claim to relief that is plausible on its face."  *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[1]

---

[1]     Though it won't matter in the end, these same Rule 12(b)(6) standards would apply to Defendants' facial challenge to subject-matter jurisdiction.  *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015) (explaining that a facial challenge occurs when the movant attacks only the complaint's sufficiency); *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (explaining that the Rule 12(b)(6) standards apply to a facial challenge).

I

Begin with Plaintiffs' claim that the Plan's fiduciaries violated their duty of prudence by failing to monitor recordkeeping expenses. *See* Am. Compl. [ECF No. 50] ¶¶ 60–106. To recap, this was the only one of Plaintiffs' four theories addressed on the merits in the first motion-to-dismiss round. The theory was rejected because the original Complaint did not allege facts "plausibly showing that the fees for these services are too high in relation to a meaningful benchmark—that is, a 'like-for-like comparison.'" *Fritton*, 2022 WL 17584416, at *5 (quoting *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2022)); *see id.* at *6–8.

A

Before analyzing the sufficiency of the Amended Complaint's allegations with respect to this theory, it is necessary to address two overarching legal issues, the first raised by Plaintiffs and the second raised by Defendants.

In their opposition brief, "Plaintiffs note that there is no requirement to provide comparators to state a claim for excessive fees." Pls.' Mem. in Opp'n [ECF No. 58] at 35 n.14. To support this assertion, Plaintiffs cite a case from the Northern District of Illinois, *Coyer v. Univar Sols. USA Inc.*, No. 1:22 CV 0362, 2022 WL 4534791, at *5 (N.D. Ill. Sept. 28, 2022). In *Coyer*, the court acknowledged the rule that "[t]o plead sufficient facts to raise an inference of a deficient decision-making process for recordkeeping services, parties must use a 'sound basis for comparison—a meaningful benchmark.'" *Id.* (quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018)). The court nonetheless determined that an ERISA excessive-fee claim need not be supported by "examples of

similar plans . . . where, according to plaintiffs, the primary drivers of price in large plans are the number of accounts and whether the plan's fiduciaries solicited competitive bids, rather than the marginal cost of recordkeeping for each participant." *Id.* I do not think it would be appropriate to accept or reach this same determination here. It is difficult to understand how generally applicable market conditions might serve as a "meaningful benchmark." The Eighth Circuit refused to accept generic "industry-wide" data as a basis for comparison in *Matousek*, 51 F.4th at 279–80. And the "like-for-like comparison" the Eighth Circuit insisted on in *Matousek* took account of what particular services the recordkeeper provided to the plan. *Id.* at 279. That is, the court did not presume that either the recordkeeper or plan acted in conformity with some set of generally present market conditions.

Defendants seem to argue that Plaintiffs' admission that they "did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan," Am. Compl. ¶ 101, renders the Amended Complaint implausible, Defs.' Reply Mem. [ECF No. 59] at 2. If that is Defendants' argument, I do not agree. Plaintiffs' lack of "actual knowledge" makes the pleading task more difficult, but certainly not impossible. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In other words, a plaintiff's lack of actual knowledge is beside the point if that plaintiff alleges facts from which liability-creating conduct may plausibly be inferred. That is what Plaintiffs seek to do here. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595–96 (8th Cir. 2009).

B

Now turn to the Amended Complaint.  It repeats all of the original Complaint's allegations regarding the excessive-recordkeeping-expenses theory and adds several categories of additional allegations, but these added allegations do not plausibly show that the Plan's fiduciaries violated their duty of prudence by failing to monitor recordkeeping expenses.

(1) Plaintiffs describe the substance of Department of Labor regulations that govern recordkeepers' fee-disclosure obligations to ERISA plan fiduciaries and plan fiduciaries' recordkeeping-services disclosure obligations to participants.  Am. Compl. ¶¶ 60–64.  It is not clear how these allegations might relate to Plaintiffs' need to plausibly allege a meaningful benchmark.  Plaintiffs do not allege that the Plan or its recordkeeper violated these regulations.  And as they are described in the Amended Complaint, the regulations themselves establish no benchmark.  Perhaps the point is that the disclosures—to which Plaintiffs allege they lack pre-suit access—are information Plaintiffs could seek in discovery that might reveal a benchmark and that Plaintiffs should be given that chance.  That point would not be persuasive because Plaintiffs cite no authority relaxing the pleading standard for ERISA breach-of-fiduciary-duty claims or permitting a sue-now-discover-later approach.

(2) The Amended Complaint adds more detailed allegations regarding the "types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan)."  *Id.* ¶ 67; *see id.* ¶¶ 67–74.  And Plaintiffs allege facts regarding the national recordkeeping market, all directed toward showing that

6

"the actual cost to a large recordkeeper with a very robust participant servicing system remains almost constant notwithstanding the level and sophistication of participant servicing the employer has elected for [its] plan."  According to Plaintiffs, these allegations regarding the national recordkeeping market together show that "a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider [*i.e.*, the recordkeeper]."  *Id.* ¶ 74.  No doubt ERISA large-plan fiduciaries possess bargaining power in the abstract, and it seems plausible that recordkeepers' business models and cost structures alleged in the Amended Complaint are factors that might affect the extent of that bargaining power.  But alleging the presence of a fiduciary's bargaining power says nothing about whether or how that bargaining power was used, or to what end.  It would be different, of course, if a plaintiff had direct knowledge of a fiduciary's recordkeeper-selection process and was able to allege the presence of some particular process-related flaw.  Plaintiffs don't allege anything like that, meaning they must allege a meaningful benchmark against which the Plan's recordkeeping fees may be assessed.  Without that, alleging that a plan fiduciary failed to use available bargaining power seems the same as alleging "that costs are too high, or returns are too low."  *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 484 (8th Cir. 2020).

(3) In their original Complaint, Plaintiffs alleged that recordkeeper Fidelity "recently stipulated in a lawsuit that a plan with tens of thousands of participants and over a billion dollars in assets could command recordkeeping fees as low as $14–$21 [per participant]."  Compl. [ECF No. 1] ¶ 77.  Plaintiffs repeat this allegation in their Amended Complaint and add a paragraph-long quote from the stipulation consistent with the original

7

allegation.  Am. Compl. ¶¶ 91, 92.  Plaintiffs also add an allegation explaining that "[t]he significance of the Fidelity stipulation is that the Plan's demographics matches [sic] favorably with the Fidelity plan's demographics demonstrating the Plan fiduciaries could have negotiated for [recordkeeping] fees as low [as] $14 and up to $21 per participant." *Id.* ¶ 93.  In response to these allegations, Defendants cite public information showing that the Fidelity plan had more than four times as many participants (approximately 58,000 versus the Plan's 13,800) and over twenty-three times as many assets (approximately $17 billion versus the Plan's $716 million).  Mem. in Supp. [ECF No. 54] at 11.  Defendants argue that this data shows the implausibility of the Amended Complaint's Fidelity/Plan comparison.  *Id.*  In their opposition brief, Plaintiffs neither respond to this argument nor rely on the Amended Complaint's Fidelity-related allegations.  I conclude, therefore, that Plaintiffs have abandoned or waived their reliance on these allegations to oppose dismissal of their excessive-recordkeeping-expenses theory.  *See Hopper v. BMO Harris Bank, N.A.*, No. 22-cv-1828 (JRT/JFD), 2023 WL 4936160, at *3 (D. Minn. Aug. 2, 2023).

(4) In their original Complaint, Plaintiffs alleged that requests for proposals (or "RFPs") were a common practice by which ERISA plan fiduciaries remain informed "regarding the fees being paid by other plans," and that "there is nothing to suggest that Defendants conducted [an] RFP at reasonable intervals – or certainly at any time from 2016 through the present – to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers[.]"  Compl. ¶¶ 79, 80.  In the first motion-to-dismiss round, I concluded that these allegations did not plausibly show a fiduciary breach because no legal authority required competitive bidding and because the

allegation that "there is nothing to suggest that" Defendants engaged in an RFP process was speculative. *Fritton*, 2022 WL 17584416, at *8. In their Amended Complaint, Plaintiffs add to their RFP allegations, citing an "early 2012" survey showing "that more than half of the plan sponsors asked indicated that they 'are likely to conduct a search for [a] recordkeeper within the next two years.'" Am. Compl. ¶ 96. The Amended Complaint then alleges that the Plan would have documented any "fiduciary reviews . . . in the form of meeting minutes,", *id.* ¶ 98, that Plaintiffs requested copies of meeting minutes before filing suit but "the Plan administrator denied this request," *id.* ¶ 99, and that Plaintiffs' lack of "actual knowledge" of the Plan's "decision-making process" has required Plaintiffs to "draw[] reasonable inferences regarding [the Plan's] fiduciary processes based upon information available to Plaintiffs," *id.* ¶¶ 101–02. These additional allegations do not change things. The survey's relevance is unclear. Its data is more than ten years old. The survey's "more than half" result is not specific. Most importantly, the survey says nothing about whether the Plan's fiduciaries conducted an RFP or why that failure might show that the Plan's recordkeeping expenses are too high.

(5) Plaintiffs identify the ten largest recordkeepers by total assets for year 2020 and allege that all ten "are peers of Merrill Lynch and capable of providing lower recordkeeping fees." *Id.* ¶¶ 103–04; *see also id.* ¶¶ 105–06. The mere presence of market competition does not trigger a plausible inference that the Plan's recordkeeping expenses are too high. If it did, every case alleging this theory would get past the motion-to-dismiss stage.

C

In addition to the new material just addressed, the Amended Complaint repeats all of the original Complaint's allegations supporting the excessive-recordkeeping-expenses theory. For the most part, these repeated allegations need not be addressed here. With one exception, Plaintiffs do not separately defend the original Complaint's allegations, and the original allegations do not give plausibility to Plaintiffs' excessive-recordkeeping-expenses theory for the reasons described in the first motion-to-dismiss round. *See Fritton*, 2022 WL 17584416, at *7–8.

The one exception concerns Plaintiffs' allegations regarding the 2014 and 2019 NEPC reports. In their opposition brief, Plaintiffs address this issue specifically and argue that these reports plausibly show that the Plan's recordkeeping expenses were too high. Pls.' Mem. in Opp'n [ECF No. 58] at 36. In the first round, I concluded that the NEPC reports did not plausibly fill the need for a like-for-like comparison because, among other reasons, the original Complaint did not describe how either "report calculated per-participant recordkeeping fees." *Fritton*, 2022 WL 17584416, at *8. Plaintiffs point out that the NEPC reports include the following statement:

> Each box plot provides a pictorial representation of record keeping, trust and custody costs by plan size, according to NEPC's 2019 Defined Contribution Plan & Fee Survey which included 121 defined contribution and deferred compensation plans. Fees were gathered from participating plans' service providers and recast in a uniform format. Displayed are the 95th percentile, 75th percentile, 25th percentile, and 5th percentile plan cost points. *The data represents broadly what plans pay and not how they pay*[.]

Pls.' Mem. in Opp'n at 36. According to Plaintiffs, this statement (and particularly the italicized sentence) "indicate[s] that the survey used both direct and indirect compensation." *Id.* This assertion, if correct, does not address the reasons the Eighth Circuit rejected reliance on an NEPC report in *Matousek*. 51 F.4th at 279–80. Regardless, the assertion is not persuasive. The reports do not explain how they calculated per-participant recordkeeping fees, and it would stretch things too far to read the italicized sentence to mean that the survey data incorporated direct and indirect (*i.e.*, revenue-sharing) compensation for every surveyed plan.

## II

Plaintiffs' excessive-management-fees theory depends on two sets of allegations that have not changed significantly from the original Complaint to the Amended Complaint. First, the Plan's default funds for participants who do not make their own investment allocations are T. Rowe Price target-date funds, and "[t]he Plan would have qualified for the collective trust ("CIT") versions of these funds, which are akin to lower cost institutional share classes, at all times during the Class Period. However, [Plaintiffs allege that] Defendants imprudently failed to consider the lower cost CIT versions of the T. Rowe Price funds (which were available since 2012), and they failed to move these investments to the CIT versions of these funds." Am. Compl. ¶ 120; *see also id.* ¶¶ 122–23. Second, Plaintiffs allege that various in-Plan funds, including the T. Rowe Price age-based funds, had expense ratios that were significantly above the "ICI median" for their fund categories. *See id.* ¶¶ 109, 121–22.

"For an investment-by-investment challenge . . . a complaint cannot simply make a bare allegation that costs are too high, or returns are too low." *Davis*, 960 F.3d at 484; *see also Meiners*, 898 F.3d at 823–24 ("[T]he existence of a cheaper fund does not mean that a particular fund is too expensive *in the market generally* or that it is otherwise an imprudent choice.  Any other conclusion would exempt ERISA plaintiffs both from pleading benchmarks for the funds and from pleading internal processes about selecting funds.").  "Rather, it 'must provide a sound basis for comparison—a meaningful benchmark.'" *Davis*, 960 F.3d at 484 (quoting *Meiners*, 898 F.3d at 822).  "An ERISA plaintiff must offer more than 'labels and conclusions' about the fees before a complaint states a claim." *Meiners*, 898 F.3d at 824 (citing *Twombly*, 550 U.S. at 555).

A

Federal courts disagree regarding whether a collective investment trust is a plausibly meaningful benchmark for a mutual fund.  Many district courts have said "no," reasoning that the two are materially different.  *E.g.*, *Riley v. Olin Corp.*, No. 4:21-cv-01328-SRC, 2022 WL 2208953, at *6 (E.D. Mo. June 21, 2022); *Matney v. Barrick Gold of N. Am., Inc.*, No. 2:20-cv-275-TC-CMR, 2022 WL 1186532, at *7–8 (D. Utah Apr. 21, 2022); *Rosenkranz v. Altru Health Sys.*, No. 3:20-cv-168, 2021 WL 5868960, at *9 (D.N.D. Dec. 10, 2021); *Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1305–06 (D. Minn. 2021); *Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 210–13 (D. Mass. 2020); *Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 795–96 (D. Minn. 2018).  As some of these courts explained, collective investment trusts and mutual funds are regulated by different agencies (the Office of the Comptroller of the Currency for collective investment trusts and the

12

Securities and Exchange Commission for mutual funds) and operate under distinct regulatory regimes. *See Matney*, 2022 WL 1186532, at *8 ("For example, the regulatory agencies overseeing each investment type are different, CITs are not required to file prospectuses or comply with reporting requirements, and CITs cannot be rolled over if the employee changes employment."); *Rosenkranz*, 2021 WL 5868960, at *9 (explaining regulatory differences between CITs and mutual funds and noting, among other things, that "collective trusts have simple disclosure requirements and cannot advertise or issue formal prospectuses"); *Parmer*, 518 F. Supp. 3d at 1305–06 (citing cases and concluding that "collective trusts are subject to unique regulatory and transparency features that make a meaningful comparison impossible"); *Moitoso*, 451 F. Supp. 3d at 212–13 (explaining regulatory differences and holding "[t]here is no inherent fiduciary duty to offer any particular type of investment vehicle, whether gold bars, hedge funds, collective accounts, or stable value funds").

An evidently smaller number of courts have reached the opposite conclusion. *E.g.*, *Davis v. Salesforce.com, Inc.*, No. 21-15867, 2022 WL 1055557 at *1–2 (9th Cir. Apr. 8, 2022) ("Whether the different regulatory regimes governing mutual funds and collective investment trusts justified defendants' delay in making the switch [to collective investment trusts] earlier is itself a factual issue that cannot be resolved at the pleading stage."); *Anderson v. Coca-Cola Bottlers' Ass'n*, No. 21-2054-JWL, 2022 WL 951218, at *10 (D. Kan. Mar. 30, 2022) ("Plaintiff has specifically alleged that the CITs were not materially different from their mutual fund counterparts, and . . . the Court is persuaded the aptness of that comparison presents a factual issue not to be decided at this stage."); *Jones v. Coca-*

*Cola Consol., Inc.*, No. 3:20-cv-00654-FDW-DSC, 2021 WL 1226551, at *5 (W.D.N.C. Mar. 31, 2021) (finding that plaintiffs stated a claim for breach of fiduciary duty where they alleged "that the underlying investments are identical when selecting a collective trust or different share class").

The better answer here is that the Amended Complaint does not allege facts plausibly showing that the T. Rowe Price Target Date collective investment trusts are a meaningful benchmark for the T. Rowe Price Target Date mutual funds.  As the cases cited earlier describe, there are material differences between collective investment trusts and mutual funds.  These distinctions are legal in character, not factual, meaning they are appropriate matters to be considered at the motion-to-dismiss stage.  And the distinctions have real-world consequences for an ERISA plan's participants.  The cases holding that collective investment trusts are reasonable comparators for mutual funds treated allegations that the mutual funds at issue in those cases were identical to collective investment trusts as factual without addressing the regulatory/legal distinctions.  *Davis*,  2022 WL 1055557 at *2[2]; *Anderson*, 2022 WL 951218, at *10; *Jones*, 2021 WL 1226551, at *5.  This approach is not persuasive.  In view of the regulatory differences between the two vehicles, a plaintiff cannot plausibly allege that an investment in a collective trust is identical to an investment in a mutual fund without alleging additional material plausibly showing that, in a given

---

[2]      *Davis* "is not precedent except as provided by Ninth Circuit Rule 36-3."  2022 WL 1055557, at *1 (note).  Ninth Circuit Rule 36-3 limits an unpublished case's precedential value to circumstances "when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion."  I take this to mean that *Davis* is not necessarily the Ninth Circuit's final word on whether collective investment trusts are reasonable comparators for mutual funds.

case, the legal distinctions make no difference.  Plaintiffs do not do that here.  They allege only that the collective trust versions of the T. Rowe Price Target Date funds "are akin to lower cost institutional share classes."  Am. Compl. ¶ 120.  In view of the regulatory differences, this allegation is both conclusory and implausible.

B

Plaintiffs identify 24 in-Plan funds as having expense ratios "above their respective ICI medians for their fund categories."  *Id.* ¶ 121.  Thirteen of these are T. Rowe Price age-based funds.  *Id.*  Setting those aside, the identified funds include, for example, the Columbia Mid Cap Index Institutional Fund (0.33% expense ratio, compared to a 0.04% ICI median), the Columbia Small Cap Index Institutional Fund (0.20% expense ratio, compared to a 0.04% ICI median), the Victory Integrity Small-Cap Value Class Y Fund (1.11% expense ratio, compared to a 0.32% ICI median), the Franklin Small Cap Growth Adv. Fund (0.83% expense ratio, compared to a 0.32% ICI median), and the Wells Fargo Special Mid Cap Value Institutional Fund (0.82% expense ratio, compared to a 0.32% ICI median).  *Id.*  Unlike with the T. Rowe Price age-based funds, Plaintiffs do not allege a comparator fund or investment vehicle for these 24 funds.

The issue is whether the Amended Complaint's comparison of the in-Plan funds' expense ratios with ICI median expense ratios plausibly shows a breach of the duty of prudence.  It does not.  Several courts have held that the ICI data repeated in the Amended Complaint is not a meaningful benchmark.  As Judge Doty explained in *Parmer*:

> [T]he ICI Study median expense ratios are not meaningful benchmarks.  Although the ICI Study considers the size of the Plan and the "category" of fund, it fails to differentiate between

15

> passively and actively managed funds.  *See* BrightScope/ICI
> Defined Contribution Plan Profile: A Close Look at 401(k)
> Plans, 2016 at 51, 62, 64 (June 2019) (including both passively
> managed and actively managed funds in the data used to
> calculate the median expense ratio).  Therefore, plaintiffs'
> allegations are insufficient to plausibly allege imprudence.

518 F. Supp. 3d at 1303; *see Meiners*, 898 F.3d at 823–24 ("[W]e believe the existence of

a cheaper fund does not mean that a particular fund is too expensive *in the market*

*generally* or that it is otherwise an imprudent choice.  Any other conclusion would exempt

ERISA plaintiffs both from pleading benchmarks for the funds and from pleading internal

processes about selecting funds."); *Braden*, 588 F.3d at 596 n.7 ("[N]othing in ERISA

requires every fiduciary to scour the market to find and offer the cheapest possible fund."

(citation and quotation marks omitted)); *accord Williams v. Centene Corp.*, No. 4:22-cv-

00216-SEP, 2023 WL 2755544, at *4 (E.D. Mo. Mar. 31, 2023); *Rodriguez v. Hy-Vee,*

*Inc.*, No. 4:22-cv-00072-SHL-HCA, 2022 WL 16648825, at *4–6 (S.D. Iowa Oct. 21,

2022); *Riley*, 2022 WL 2208953, at *5; *Rosenkranz*, 2021 WL 5868960, at *10.  There is

more.  The ICI report itself instructs that it is not intended for use as a benchmark.  *The*

*BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2017*,

ICI, https://www.ici.org/system/files/attachments/20_ppr_dcplan_profile_401k.pdf, at 60

(Aug. 2020) ("The fees of a particular plan will depend on factors specific to the plan, such

as the exact investment options the plan offers and whether administrative and

recordkeeping fees are included in the expense ratios or charged outside of them.

Consequently, this material is not intended for benchmarking the costs of specific plans to

the broad averages presented here.").

III

To support their expensive-share-class theory, Plaintiffs allege that Defendants selected for inclusion in the Plan more expensive, individual share classes when they could have—and should have—selected lower cost, institutional share classes. Plaintiffs allege there is no difference between the classes other than cost, and a prudent fiduciary would switch to the less expensive share classes. Am. Compl. ¶¶ 125, 127–29. The Plan would have qualified for these lower-cost share classes because of its large size; and even if the Plan did not meet the investment minimum to qualify, as appears to be the case for a few in-Plan funds, "it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan willing to add the fund to its menu of designated investment options." *Id.* ¶¶ 126, 132.

Defendants argue that this theory is not plausible because, in their view, there is an obvious alternative explanation for their selection of higher-cost share classes—revenue sharing. The presence of an obvious alternative explanation for assertedly unlawful conduct may justify dismissal under Rule 12(b)(6). Allegations are implausible when there exists "a concrete, 'obvious alternative explanation' for the defendant's conduct." *Braden*, 588 F.3d at 597 (quoting *Twombly*, 550 U.S. at 567). "An inference pressed by the plaintiff is not plausible if the facts he points to are precisely the result one would expect from lawful conduct in which the defendant is known to have engaged." *Id.* As alleged, "[r]evenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to

17

provide."  Am. Compl. ¶ 75.  Defendants argue that Plaintiffs' allegations are implausible because "Plaintiffs acknowledge that different share classes of funds are not identical," because they allege that the Plan utilizes revenue sharing, and because the Eighth Circuit has noted that revenue sharing arrangements are "common and 'acceptable' investment industry practices that frequently inure to the benefit of ERISA plans."  Defs.' Mem. in Supp. at 18 (quoting *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014)); *see* Am. Compl. ¶¶ 54–55.

Defendants' explanation does not justify dismissal.  Accepting Defendants' proffered inference—that the prudent use of revenue sharing caused the individual share classes to have a higher sticker price—would necessitate finding that the Amended Complaint's allegations regarding the imprudent use of revenue sharing are not correct, that revenue sharing occurred in each of the individual-share-class funds at issue, and that this revenue sharing benefitted the Plan.  It would be inappropriate to resolve these issues at the motion-to-dismiss stage.  *See Forman v. TriHealth, Inc.*, 40 F.4th 443, 450–53 (6th Cir. 2022); *Kong v. Trader Joe's Co.*, No. 20-56415, 2022 WL 1125667, at *1 (9th Cir. Apr. 15, 2022); *Schave v. CentraCare Health Sys.*, No. 22-cv-1555 (WMW/LIB), 2023 WL 1071606, at *4–5 (D. Minn. Jan. 27, 2023); *Smith v. Shoe Show, Inc.*, No. 1:20CV813, 2022 WL 583569, at *5–6 (M.D.N.C. Feb. 25, 2022).

IV

Plaintiffs allege that Defendants acted imprudently by failing to remove from the Plan one fund that consistently underperformed, the Victory Integrity Small Cap Value

Fund Class Y.[3]  Am. Compl. ¶ 135.  Plaintiffs allege that this fund "consistently underperformed both its benchmark Morningstar US Small Brd Val Ext TR USD index and lower-cost funds in the same fund category that measured their performance against the same benchmark index," including "the less expensive R6 Class version of the Victory Integrity Small Cap Value Fund." *Id.* ¶¶ 135–37.

This theory is not plausibly alleged.  "To show that 'a prudent fiduciary in like circumstances' would have selected a different fund based on the cost or performance of the selected fund, a plaintiff must provide a sound basis for comparison—a meaningful benchmark." *Meiners*, 898 F.3d at 822.  The Morningstar index Plaintiffs allege as the benchmark here was not created until December 21, 2020.  *See* Am. Compl. ¶ 135 (heading); *Morningstar US Small Cap Broad Value*, Morningstar, https://indexes. morningstar.com/our-indexes/details/morningstar-us-small-cap-roadvalue-extended-FS0000GHCB?currency=USD&variant=TR&tab=overview (last visited August 21, 2023).  It is difficult to understand how an ERISA fiduciary's process during a period commencing February 14, 2016, *see* Am. Compl. ¶ 1, n.2, might plausibly be judged imprudent by reference to a single fund that allegedly underperformed a benchmark that would not exist until five years later.  *See Patterson v. Morgan Stanley*, No. 16-cv-6568 (RJS), 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019) ("[T]hese allegations are impermissibly hindsight-based.  Data compiled in 2016 would not have been known to the fiduciaries

---

[3]    Defendants' jurisdictional challenge to this theory is premised on the Rule 12(b)(6) dismissal of every other theory.  Defs.' Mem. in Supp. at 22–23.  Because Plaintiffs' expensive-share-class theory will not be dismissed, the jurisdictional challenge fails. *Braden*, 588 F.3d at 591–94.

earlier in the class period[.]").   And Plaintiffs allege no facts showing why their identified "better performing, lower cost alternatives in the same fund category" are useful as meaningful comparators.   Am. Compl. ¶ 137.   Bare assertions of net expense ratios and average annual returns, devoid of any context or explanation regarding the methods by which these figures were calculated, renders any meaningful comparison impossible.

Plaintiffs argue that consideration of the Morningstar benchmark's onset date and any other analysis of the asserted benchmarks' soundness are not proper matters for consideration at the motion-to-dismiss stage.   These contentions are not persuasive. Documents that are necessarily embraced by the pleadings may be considered in adjudicating a Rule 12(b)(6) motion.   *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003) (citation omitted).   Materials embraced by the complaint include "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading."   *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) (quoting *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996)).   Here, Plaintiffs allege the Morningstar benchmark's contents.   Am. Compl. ¶ 136.   Defendants identify the benchmark's inception date by reference to the same source.   Defs.' Mem. in Supp. at 25.   And Plaintiffs do not question the source's authenticity.   *See* Pls.' Mem. in Opp'n at 32.   Plaintiffs support their contention that any analysis of their alleged benchmarks at this stage is improper with citations to out-of-circuit authority.   *Id.* (citing *Garcia v. Alticor, Inc.*, No. 1:20-CV-1078, 2021 WL 5537520, at *6 (W.D. Mich. Aug. 9, 2021) ("[W]hether a certain fund is a good comparator for another fund is clearly a fact-intensive issue, and the Court cannot rule as a matter of

law that the funds Plaintiff has identified as comparators are improper.")) The Eighth Circuit, however, has considered whether plaintiffs alleged a "meaningful benchmark" on a Rule 12(b)(6) motion. *Meiners*, 898 F.3d 820.

There is another problem with this theory (in addition to the absence of a benchmark). Defendants argued that the Victory Fund's alleged underperformance according to the Morningstar benchmark—1.10% over the previous 3-year period, 0.18% over the previous 5-year period, and 0.55% over the previous 10-year period—is not sufficiently substantial to support an inference of imprudence. Defs.' Mem. in Supp. at 27–28. Defendants cited several cases in which comparable underperformance was found insufficient to infer a flawed process. *Patterson*, 2019 WL 4934834, at *10–11 ("Plaintiffs allege that the [fund] had an average annual return of 7.42% compared to its benchmark . . . which returned 8.16% over the same ten-year period. . . . "[S]uch a small disparity in performance relative to its benchmark does not support the inference that Defendants were imprudent to retain the [fund]."); *Forman v. TriHealth, Inc.*, 563 F. Supp. 3d 753, 764 (S.D. Ohio 2021) (finding that a range of variances, with the largest at over 2%, were "simply too small to raise a plausible breach of the fiduciary duty claim"), *aff'd in relevant part and vacated on other grounds*, 40 F.4th 443, 449 (6th Cir. 2022); *Gonzalez v. Northwell Health, Inc.*, 632 F. Supp. 3d 148, 164 (E.D.N.Y. 2022) (finding that allegations of underperformance by "2.33% on a three-year trailing basis and 2.57% on a rolling five-year trailing basis" were "not the type of substantial underperformance over a lengthy period that gives rise to a plausible inference that a prudent fiduciary would have removed

these funds from the plan's menu of options"). Plaintiffs did not respond to this argument. *See Hopper*, 2023 WL 4936160, at *3.

V

Plaintiffs allege that Defendants breached the fiduciary duty of loyalty. Am. Compl. ¶¶ 2, 144; Pls.' Mem. in Opp'n at 37–38. "The duty of loyalty requires fiduciaries to act 'for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan.'" *Larson*, 350 F. Supp. 3d at 804 (quoting 29 U.S.C. § 1104(a)(1)(A)). "Perhaps the most fundamental duty of a [fiduciary] is that he must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000) (cleaned up). An act which has the mere effect of furthering the interests of a third party falls short of a violation of the duty of loyalty, whereas an act taken with that as the goal may not. *Larson*, 350 F. Supp. 3d at 804. "[A] duty of loyalty claim may be dismissed despite a viable duty of prudence claim." *Parmer*, 518 F. Supp. 3d at 1308 (citing *Larson*, 350 F. Supp. 3d at 804).

Plaintiffs do not plausibly allege a duty-of-loyalty breach. The Amended Complaint includes two references to loyalty:

> 2.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of **loyalty** and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).

22

. . .

> 144.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence/**Loyalty** Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for the Prudence Defendants' breaches, as set forth in their Prayer for Relief.

Am. Compl. ¶¶ 2, 144 (emphasis added).  Paragraph 2 restates the law.  It includes no allegation directed at any Defendant.  Paragraph 144 pleads the legal conclusion that the "Loyalty Defendants are liable" but does not allege why.  Unlike the "Prudence Defendants," which the Amended Complaint defines as "Defendants Committee and its members," *id.* ¶ 140, there is no other reference to the "Loyalty Defendants."  These allegations do not plausibly show that any Defendant breached the duty of loyalty.

VI

Plaintiffs allege that Taylor Corporation and its Board breached their fiduciary duty by failing to monitor and evaluate the performance of the Committee, by failing to monitor the processes by which the Plan's investments were evaluated, and by failing to remove the Committee as a fiduciary.  Am. Compl. ¶ 150.  As a result, Plaintiffs allege, Taylor Corporation and the Board are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2).  *Id.* ¶ 152.

"To state a claim for failure to monitor under ERISA, a plaintiff must allege facts that the (1) entity charged with the breach was responsible for appointing and removing fiduciaries responsible for [the] fiduciary conduct in question; and (2) entity charged with this duty to monitor also had knowledge of or participated in fiduciary breaches by the

23

appointees." *Krueger v. Ameriprise Fin., Inc.*, No. 11-cv-02781 (SRN/JSM), 2012 WL 5873825, at *18 (D. Minn. Nov. 20, 2012) (quotation omitted). "ERISA requires persons responsible for appointing and removing plan fiduciaries to monitor the activities of their appointees at reasonable intervals." *Scalia v. Reliance Tr. Co.*, No. 17-cv-4540 (SRN/ECW), 2021 WL 795270, at *22 (D. Minn. Mar. 2, 2021) (quotations omitted).

Defendants argue that Plaintiffs allege no facts regarding the monitoring process and admit they know nothing about the monitoring process, but these contentions are not convincing. Plaintiffs properly support their claim with factual allegations—that Taylor and the Board had the authority to appoint and remove fiduciaries of the Plans, that they appointed members of the Committee to serve as fiduciaries to the Plans, that they had no system in place for monitoring or evaluating the Committee, and that Taylor and the Board failed to monitor and evaluate the performance of the Committee, failed to monitor the processes by which the Plan's investments were evaluated, and failed to remove the Committee as a fiduciary. Am. Compl. ¶¶ 24–30, 147–50; *see supra* Part III. Defendants' motion will be denied as to this claim.

24

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendants' Motion to Dismiss [ECF No. 51] is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.      The motion is **GRANTED WITHOUT PREJUDICE**[4] as to Plaintiffs' excessive-recordkeeping-expenses, excessive-management-fees, and underperforming-fund theories, and as to Plaintiffs' duty-of-loyalty claim.

2.      The motion is **DENIED** in all other respects.

Date:  August 21, 2023                           s/ Eric C. Tostrud
                                                 Eric C. Tostrud
                                                 United States District Court

---

[4]      The dismissal is without prejudice for the same reasons explained in *Miles v. Simmons Univ.*, 514 F. Supp. 3d 1070, 1079–80 (D. Minn. 2021).